No. 15-2038

IN THE

# United States Court of Appeals
### FOR THE SEVENTH CIRCUIT

HERITAGE COAL CO.,

*Petitioner,*

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS,
UNITED STATES DEPARTMENT OF LABOR and
THOMAS MITCHELL,

*Respondents.*

ON PETITION FOR REVIEW OF A DECISION
AND ORDERS OF THE BENEFITS REVIEW BOARD,
UNITED STATES DEPARTMENT OF LABOR

**PETITIONER'S BRIEF AND SHORT APPENDIX**

Mark E. Solomons
Laura Metcoff Klaus
GREENBERG TRAURIG LLP
Suite 1000
2101 L Street, N.W.
Washington, D.C. 20037
(202) 533-2361

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT
(formerly known as Certificate of Interest)

Appellate Court No: <u>15-2038</u>

Short Caption:  <u>Heritage Coal Co. v. Director, OWCP and Thomas Mitchell</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement stating the following information in compliance with **Error! Hyperlink reference not valid.** and **Error! Hyperlink reference not valid.** . **Each attorney is asked to complete and file a Disclosure Statement with the Clerk of the Court as soon as possible after the appeal is docketed in this Court. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing the item #3):
<u>Heritage            Coal            Company</u>

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Greenberg Traurig, LLP, and White & Risse, LLP . appeared for Heritage Coal Company in the case before the administrative agency.  Greenberg Traurig is appearing for Heritage Coal Company before this Court</u>

(3) If the party or amicus is a corporation:

       i) Identify all its parent corporations, if any; and
       <u>Heritage Coal Company is owned by Patriot Coal Corp.</u>

       ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:
       <u>Patriot Coal Corp. was publicly traded over the counter (OTC: PATCA); it voluntarily filed for Chapter 11 bankruptcy protection on May 12, 2015</u>

       **The Court prefers the statement be filed immediately following docketing**; but, the disclosure statement shall be filed with the principal brief or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. The attorney furnishing the statement must file an amended statement to reflect any material changes in the required information. The text of the statement (i.e. caption omitted) shall also be included in front of the table of contents of the party's main brief.

       Attorney's Signature: <u>s/Mark E. Solomons</u>            Date: <u>August 4, 2015</u>

       Attorney's Printed Name: <u>Mark E. Solomons</u>

       Address: <u>Greenberg Traurig LLP</u>
       <u>2101 L Street, N.W. Suite 1000</u>
       <u>Washington, D.C. 20037</u>
       Phone Number: <u>202-533-2361</u>
       Fax Number: <u>202-261-0129</u>
       E-Mail Address: <u>Solomonsm@gtlaw.com</u>

**rev. 9/99 AK**

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ...............................................................i

TABLE OF AUTHORITIES ......................................................................................iii

I.     JURISDICTIONAL STATEMENT ..............................................................1

II.    STATEMENT OF THE ISSUE ...................................................................2

III.   STATEMENT OF THE CASE.....................................................................2

      A. Proceedings Below...........................................................................2

      B. The Medical Evidence ............................................................4

IV.   SUMMARY OF ARGUMENT .....................................................................8

V.    ARGUMENT ...........................................................................................10

    A.    Applicable Standard of Review...............................................10

    B.    An Unreasoned Opinion Is Not Proof of Any
        Element of Entitlement ........................................................11

    C.    The ALJ Erred in Relying on the Preamble to Supply the Reasoning
        Missing from Dr. Houser's Opinion. ....................................16

CONCLUSION.........................................................................................................23

SHORT APPENDIX

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Blakley v. Amax Coal Co.,
   54 F.3d 1313 (7th Cir. 1995) ................................................................. 10

Consolidation Coal Co. v. Director, OWCP [Beeler],
   521 F.3d 723 (7th Cir. 2008) ............................................................ 20,21

Creech v. Benefits Review Bd.,
   841 F.2d 706 (6th Cir. 1988) ............................................................ 14,15

Daubert v. Merrill Dow Pharms., Inc.,
   509 U.S. 579 (1993) ......................................................................... 9,15

Dir., Office of Workers' Comp. Programs v. Greenwich Collieries,
   512 U.S. 267 (1994) ............................................................................ 16

Greene v. King James Coal Mining, Inc.,
   575 F.3d 628 (6th Cir. 2009) ................................................................. 14

Gulley v. Director, OWCP,
   397 F.3d 535 (7th Cir. 2005) ................................................................. 22

Higgins v. Koch Dev. Corp.,
   __ F.3d __, No. 14-2207 (7th Cir. July 20, 2015) ................................... 20

Huey v. United Parcel Serv., Inc.,
   165 F.3d 1084 (7th Cir. 1999) ............................................................... 12

Maddaleni v. The Pittsburg & Midway Coal Mining Co.,
   14 Black Lung Reporter (MB) 1-135 (Benefits Review Bd. 1990) ....................... 17

Meyer v. Zeigler Coal Co.,
   894 F.2d 902 (7th Cir.), cert. denied, 498 U.S. 827 (1990).................................. 23

Mid-State Fertilizer Co. v. Exchange Nat'l Bank,
   877 F.2d 1333 (7th Cir. 1989) ............................................................. 9,12

Milburn Colliery Co. v. Hicks,
   138 F.3d 524 (4th Cir. 1998) ............................................................ 15,23

iii

Myers v. Ill. Central R. Co.,
    629 F.3d 639 (7th Cir. 2010) ............................................................ 15,19

Nat'l Mining Ass'n v. Dep't of Labor,
    292 F.3d 849 (D.C. Cir. 2002) ............................................................. 19

Niam v. Ashcroft,
    354 F.3d 652 (7th Cir. 2004) ................................................................ 16

Old Ben Coal Co. v. Dir., Office of Workers' Comp. Programs,
    62 F.3d 1003 (7th Cir. 1995) ................................................................ 10

Peabody Coal Co. v. Director, OWCP,
    972 F.2d 880 (7th Cir. 1992) ................................................................ 15

Peabody Coal Co. v. Durbin,
    165 F.3d 1126 (7th Cir. 1999) .............................................................. 22

Peabody Coal Co. v. Hale,
    771 F.2d 246 (7th Cir. 1985) ................................................................ 10

Peabody Coal Co. v. McCandless,
    255 F.3d 465 (7th Cir. 2001) ................................................................ 15

Peabody Coal Co. v. Vigna,
    22 F.3d 1388 (7th Cir. 1994) ............................................................ 10,23

Quercia v. United States,
    289 U.S. 466 (1933) .............................................................................. 17

Ragsdale v. Wolverine World Wide, Inc.,
    535 U.S. 81 (2002) .................................................................................. 9

Risher v. OWCP,
    940 F.2d 327 (8th Cir. 1991) ................................................................ 14

Rosen v. Ciba-Geigy Corp.,
    78 F.3d 316 (7th Cir 1996) ................................................................... 15

Sahara Coal Co. v. Fitts,
    39 F.3d 781 (7th Cir. 1994) .................................................................. 14

Shelton v. Director, OWCP,
    899 F.2d 690 (7th Cir. 1990) ................................................................ 22

Stafford v. Ford Motor Co.,
    790 F.2d 702 (8th Cir. 1986) ................................................................ 16

Sunny Ridge Mining Co., Inc. v. Keathley,
    773 F.3d 734 (6th Cir. 2014) ................................................................ 11

Tamraz v. Lincoln Elec. Co,
    620 F.3d 665 (6th Cir. 2010), cert. denied, 131 S.Ct. 2454 (2011)........................ 15

U.S. Steel Mining Co., Inc. v. Director, OWCP,
    187 F.3d 384 (4th Cir. 1999) ................................................................ 15

United States v. Barnhart,
    599 F.3d 737 (7th Cir. 2010) ................................................................ 16

United States v. Martin,
    189 F.3d 547 (7th Cir. 1999) ................................................................ 16

United States v. Mead Corp.,
    533 U.S. 218 (2001) ................................................................ 18

Walker v. Soo Line R.R. Co.,
    208 F.3d 581 (7th Cir. 2000) ................................................................ 14

Wyeth v. Levine,
    555 U.S. 555 (2009) ................................................................ 9,18

Zeigler Coal Co. v. Dir., Office of Workers' Comp. Programs,
    213 F.3d 332 (7th Cir. 2002) ................................................................ 12

Zeigler Coal Co. v. Sieberg,
    839 F.2d 1280 (7th Cir.1988) ................................................................ 15

Zenith Elecs. Corp. v. WH-TV Broad. Corp.,
    395 F.3d 416 (7th Cir. 2005) ................................................................ 12

**Statutes and Regulations**

Administrative Procedure Act, 5 U.S.C. §§ 551-559 ...................................... 10,15,18
    5 U.S.C. § 553(b) ................................................................ 4
    5 U.S.C. § 556(d) ................................................................ 10

Black Lung BenefitsAct, 30 U.S.C. §§ 901-945 ........................................ 1
    30 U.S.C. § 901(a) ................................................................ 11
    30 U.S.C. § 932(a) ................................................................ 1
    30 U.S.C. § 936(a) ................................................................ 18

Longshore Act, 33 U.S.C. §§ 901-950
    33 U.S.C. § 921(b) ................................................................. 1
    33 U.S.C. § 921(c) ................................................................. 1

Black Lung Benefits Act of 1972,
    86 Stat. 150 ........................................................................ 1

Black Lung Benefits Reform Act of 1977,
    92 Stat. 95 .......................................................................... 1

Black Lung Benefits Revenue Act of 1977,
    92 Stat. 11 .......................................................................... 1

Black Lung Benefits Revenue Act of 1981 and the Black Lung Benefits
    Amendments of 1981, 95 Stat. 1635 ....................................... 1

Consolidated Omnibus Budget Reconciliation Act,
    Pub. L. No. 99-272, 100 Stat. 312, 313 (1986) ......................... 1

Omnibus Reconciliation Act of 1987,
    Pub. L. No. 100-203, 101 Stat. 1330 (1987) ............................ 1

Patient Protection and Affordable Care Act,
    Pub. L. No. 111-148, § 1556 (March 23, 2010) ....................... 1

Black Lung Program Regulations
    20 C.F.R. Part 718 ............................................................... 2
    20 C.F.R. § 718.201 ............................................................ 11
    20 C.F.R. § 718.201(a)(2) .................................................. 3,11
    20 C.F.R. § 718.201(b) ...................................................... 3,11
    20 C.F.R. §§ 718.202-718.204 ............................................... 3
    20 C.F.R. § 718.202(a) ....................................................... 11
    20 C.F.R. § 718.202(a)(4) ................................................... 11
    20 C.F.R. § 718.204(c) ....................................................... 11
    20 C.F.R. § 718.304 ........................................................... 11

65 Fed. Reg. 79,938 (Dec. 20, 2000) ........................................ 19

65 Fed. Reg. 79,940 (Dec. 20, 2000) ........................................ 17

65 Fed. Reg. 79,941 (Dec. 20, 2000) ........................................ 19

65 Fed. Reg. 79,943 (Dec. 20, 2000) ........................................ 17

**Other Authorities**

*Green, et al.*, "Reference Guide on Epidemiology," REFERENCE MANUAL
  ON SCIENTIFIC EVIDENCE 549 (3d ed. 2011) ......................................................... 19

Paul S. Miller & Bert W. Rein, "`Gatekeeping' Agency Reliance on
  Scientific and Technical Materials After Daubert: Ensuring
  Relevance and Reliability in the Administrative Process," 17 TOURO
  L.REV. 297 (2000) ................................................................................................. 16

## I.     JURISDICTIONAL STATEMENT

Heritage Coal Company ("Heritage") seeks relief from an award of benefits under the Black Lung Benefits Act (the "BLBA" or "Act").[1]  The administrative law judge ("ALJ") issued the decision and order that is the subject of this appeal on January 24, 2014. Short Appendix ("S.App.") 11.  Heritage filed an appeal to the Benefits Review Board, U.S. Department of Labor ("DOL"), within thirty days, on February 24, 2014.[2]  The appeal was timely and the Board had jurisdiction to consider the case under 33 U.S.C. § 921(b), *incorporated by reference into* 30 U.S.C. § 932(a).  On December 29, 2014, the Benefits Review Board issued a decision and order affirming the ALJ's decision.  S.App. 3.  Heritage timely moved for reconsideration of that decision, which the Board denied on March 17, 2014.  S.App. 1.  That decision was a final decision within the meaning of 33 U.S.C. § 921(b), *incorporated by reference into* 30 U.S.C. § 932(a).

This Court docketed Heritage's appeal from that final decision on May 13, 2015, within sixty days of the Board's decision.  The appeal is timely under 33 U.S.C. § 921(c), *incorporated by reference into* 30 U.S.C. § 932(a).  The miner, Thomas Mitchell, last worked in the State of Indiana.  These facts establish this Court's appellate and subject matter jurisdiction.

---

[1]     Part C of Title IV of the Federal Coal Mine Health and Safety Act of 1969, as amended by the Black Lung Benefits Act of 1972, 86 Stat. 150, and as further amended by the Black Lung Benefits Reform Act of 1977, 92 Stat. 95, the Black Lung Benefits Revenue Act of 1977, 92 Stat. 11, the Black Lung Benefits Revenue Act of 1981 and the Black Lung Benefits Amendments of 1981, 95 Stat. 1635, Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. No. 99-272, 100 Stat. 312, 313 (1986), and Omnibus Reconciliation Act of 1987, Pub. L. No. 100-203, 101 Stat. 1330 (1987), and the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1556 (March 23, 2010).

[2]     February 23, 2014 fell on a Sunday.

## II.     STATEMENT OF THE ISSUE

Does a medical opinion that contains nothing but an unexplained conclusion that a claimant's pulmonary disability was due to coal dust exposure and cigarette smoking satisfy the bare minimum of substantial evidence necessary to support entitlement to benefits under the Black Lung Benefits Act.

## III.    STATEMENT OF THE CASE

### A.     The Proceedings Below

Thomas Mitchell filed a claim for federal black lung benefits on February 1, 2010, twelve years after his coal mine employment ended and five years after he had retired from work altogether.  Director's Exhibit ("Dx.") 3, Dx. 4.  He was 65 years old, and, by all accounts, was morbidly obese, and partially paralyzed on account of a stroke.  Dx. 3, Dx. 12.

After reviewing the initial medical evidence, the district director issued a proposed decision denying benefits.  Dx. 29.  Mitchell timely requested a hearing and the case proceeded to the Department's Office of Administrative Law Judges for that purpose.  Dx. 30, Dx. 34.  Only Heritage submitted additional evidence.

On January 24, 2014, a Department of Labor administrative law judge issued a decision on the record.  She concluded that Mitchell worked as a coal miner for at least thirteen years, and smoked cigarettes, one-half to one package daily beginning in 1959 or 1960, and ending in 1988, with a possible five-year break starting in 1962.  S.App. 14, 16.  ALJ Decision and Order ("D&O") at 4, 6.  On the merits, the ALJ analyzed Mitchell's entitlement under DOL's permanent eligibility criteria at 20 C.F.R. Part 718.  These rules require that the proof establish four basic facts:  (1) the existence of pneumoconiosis; (2) that the pneumoconiosis arose out of coal mine employment; (3) total disability for work on account of a respiratory or pulmonary impairment; and (4) total respiratory disability due to pneumoconiosis.  20 C.F.R. §§

2

718.202-718.204.  The ALJ found that by 2010, Mitchell was totally disabled for work.  The dispute focused on whether Mitchell had pneumoconiosis or black lung disease and whether that condition was a substantial cause of any disability.

The ALJ concluded that the x-ray evidence did not establish that Mitchell had pneumoconiosis.  S.App. 30: ALJ D&O at 20.  Instead, the ALJ decided that the opinion of a single doctor, Dr. Houser, was sufficient to establish "legal" pneumoconiosis, defined as "any chronic lung disease or its impairment and its sequelae arising out of [*i.e.*, "significantly related to or substantially aggravated by] coal mine employment."  20 C.F.R. § 718.201(a)(2), (b).  The ALJ recognized that in order to constitute substantial evidence, an opinion must be both documented (*i.e.*, based on a physical examination, symptoms, work and social histories or test results) and reasoned (*i.e.*, resting on documentation adequate to support the physician's conclusions).  She declared that Dr. Houser's opinion satisfied these requirements:

> He diagnosed moderately severe obstructive disease.  He also said that coal dust and cigarette smoking contributed to the miner's obstructive disease.  I construe Dr. Houser's opinion to be a diagnosis of legal pneumoconiosis.  Dr. Houser's attribution of the Claimant's obstructive disease to a combination of factors is consistent with the regulations, and sufficient to meet the requirement that coal dust be a contributing cause to the Claimant's impairment to make a diagnosis of legal pneumoconiosis.  I find that his opinion was documented and reasoned.

S.App. 31: ALJ D&O at 21.  *See also* S.App. at 33: ALJ D&O at 23 ("But Dr. Houser's opinion was in better accord with the evidence underlying his opinion and the premises underlying the regulations.").  She discredited the contrary opinions of Drs. Repsher and Renn because, among other reasons, they were not "consistent with the premises underlying the regulations that coal dust exposure and cigarette

3

smoking have additive effects, that they affect the lungs by similar mechanisms, and that coal dust exposure can cause clinically significant obstructive disease even in the absence of clinical pneumoconiosis." S.App. 32: ALJ D&O at 22. The ALJ concluded that Dr. Houser's report also established Mitchell's disability due to pneumoconiosis, having discredited the contrary opinions for failing to diagnosis legal pneumoconiosis. S.App. 35, 36: ALJ D&O at 25-26.

Heritage timely appealed to the Benefits Review Board. On December 29, 2014, the Board affirmed the ALJ's decision and analysis. S.App. 3. The Board rejected Heritage's contention that in determining whether pneumoconiosis was present, the ALJ impermissibly relied on the Department of Labor's preamble to its 2001 regulation both to supply the reasoning missing from Dr. Houser's report and to discredit the reasoning provided by Drs. Repsher and Renn. This preamble was not subject to notice and comment rulemaking under 5 U.S.C. § 553(b) and is substituted for evidence in the record by the ALJ's analysis.

Heritage requested reconsideration, which the Board refused without opinion. S. App. 1. Heritage's timely appeal to this Court followed.

B.     The Medical Evidence

At Mitchell's request, Dr. William Houser examined Mitchell on April 26, 2010. Dx. 10, Appendix ("App."). 7: Dx. 11 at 18. Although the record established at least thirteen years of coal mine employment (S.App. 14, 16), Mitchell told the doctor that he worked as a miner for twenty-six years, and then worked as a master electrician at a synthetic fuel plant for six years. App. 7: Dx. 11 at 18. Mitchell reported a history of longstanding attacks of wheezing, arthritis, high blood pressure, a prior total knee replacement, and, in December 2009, a stroke which left him with some slight left-sided weakness; Mitchell used a walker and reported that his mobility was limited by his multiple orthopedic problems. App. 8, 9, 11: Dx. 11

4

at 19, 20, 22.  Mitchell also reported that he smoked cigarettes from 1959 to 1988, up to one package daily.  App. 8.  But, he took no medication for any respiratory disease.[3]  On physical examination, the doctor described Mitchell as obese and noted edema bilaterally.  App. 9.  Other than diminished breath sounds, the doctor's examination of the chest and lungs was normal.  App. 10.  A chest x-ray was negative for pneumoconiosis.  Dr. Houser deemed the pulmonary function tests invalid due to poor effort.  Arterial blood gas tests showed mild hypoxemia and mild hypercapnia.  App. 11.  Dr. Houser nevertheless diagnosed moderate disabling chronic obstructive pulmonary disease ("COPD"), as well as degenerative arthritis and history of stroke.  App. at 11, 12.  As for the source of Mitchell's COPD, the doctor stated:

> **Etiology of Cardiopulmonary Diagnosis:**
> 1.    COPD – secondary to former cigarette smoking and to exposure of coal and rock dust arising from coal mine employment.

App. 11.  This bare conclusion is all the doctor offered.

The other pulmonary disease specialists who evaluated Mitchell did not find any coal-related disease or disability.  Dr. Lawrence Repsher examined Mitchell and reviewed Dr. Houser's evaluation.  App. 53.  He diagnosed Pickwickian Syndrome.  Mitchell weighed 273 pounds, and the doctor explained that Mitchell's edema and diminished breath sounds were caused by morbid obesity—the result of fatty tissue surrounding his chest wall that caused a "lazy breathing center."  App. 67 (Repsher Tr. at 7).  *See also* App. 75-76, 78 (Repsher Tr. at 15-16, 18).  The edema also was consistent with congestive heart failure.  *Id.* at 7-10.  Mitchell's chest x-ray was negative for pneumoconiosis, pulmonary function studies were invalid due to very

---

[3]    Mitchell took Lipitor, Altace, Lasix, Baclofen, Avodart, Flomax, and Aggrenox to reduce the risk of stroke.  Dx. 6 at 2, App. 9 (Dx. 11 at 20).

5

poor effort and cooperation, blood gas tests were consistent with Pickwickian Syndrome, and a resting electrocardiogram was consistent with Mitchell's obesity. App. 57, 58; App. 72, 74 (Repsher Tr. at 12, 14).

Dr. Repsher concluded that Mitchell's COPD was "overwhelmingly most likely due to his cigarette smoking habit," relying on the fact that Mitchell's test results and physical findings did not show the effects of a coal dust related disease and the disproportionate reduction in the $FEV_1/FVC$ ratio on his pulmonary function studies was characteristic of cigarette smoking. App. 57, 59. Although he acknowledged that coal dust can, in some people, contribute to the development of COPD, Dr. Repsher noted that this occurs in only a minority of cases. The likelihood that this occurred in Mitchell's case was further diminished by the fact that his work took place mostly after 1970, and ended many years earlier. If coal dust contributed, the doctor believed the contribution was de minimis given the average impact of aging, cigarette smoking and coal dust exposure coupled with the effects of Mitchell's obesity. He also believed that Mitchell had underlying congestive heart failure. App. 58, 59; App. 79, 83-84, 90 (Repsher Tr. at 19, 23-24, 30). Dr. Repsher discussed the medical literature that supported his view. App. 59-60. Finally, he explained that if Mitchell's coal mine employment spanned thirteen years rather than the twenty-six years he alleged, the loss of function due to coal dust exposure would have been even less. In any event, he believed that Mitchell's COPD, regardless of the source, did not contribute significantly to his respiratory failure. Mitchell's respiratory problems were due to obesity which caused congestive heart failure and Pickwickian syndrome. App. 68-71, 85-87, 91 (Repsher Tr. at 8-11, 25-27, 31).

Mitchell submitted no evidence to rehabilitate Dr. Houser's opinion. The only additional evidence consisted of treatment notes and an opinion of Dr. Renn, who

reviewed all the medical evidence and agreed with Dr. Repsher's assessment. App. 13, 20. He diagnosed COPD "owing to tobacco smoking" with a bronchospastic component, history of obstructive sleep apnea,[4] and pulmonary embolus, but not pneumoconiosis. He also diagnosed systemic hypertension, the sequelae of a stroke-related left hemiparesis, hyperlipidemia, severe, approaching morbid, obesity, and gastroesophageal reflux disease (GERD). App. 16. He believed that the bronchospastic nature of Mitchell's obstruction, disproportionate reduction of the volumes and flows, and presence of hypercarbia[5] were all consistent with tobacco smoking but not coal dust exposure. App. 17; App. App. 24-25 (Renn Tr. at 16-21) (clinical pneumoconiosis); App. 26-27 (Renn Tr. at 22-29) (legal pneumoconiosis). He noted Mitchell started smoking cigarettes as a teenager[6] while his lungs were still in the growth phase. That early onset of cigarette smoking is known to cause obstructive disease later in life. App. 26 (Renn Tr. at 24-25). Finally, the doctor added that Mitchell's obesity was the greatest risk factor for obstructive sleep apnea, which can result in systemic hypertension, pulmonary hypertension, cerebrovascular disease, ischemic stroke, heart failure, cardiac arrhythmias and hypoventilation tending to hypercarbia. He concluded that this is what occurred in Mitchell's case. App. 17. *See also* App. 27 (Renn Tr. at 26-27). Thus although Mitchell was disabled for his last work as a coal miner, that disability was not caused or aggravated by his coal dust exposure, no matter how long Mitchell worked. App. 27 (Renn Tr. at 29). Dr. Renn thus "rule[d] out ... any effect [of coal dust exposure] whatsoever ...." *Id.*

---

[4]    Dr. Renn explained that obstructive sleep apnea is also known as Pickwickian syndrome, most commonly caused by obesity. App. 26-27 (Renn Tr. at 25-26).

[5]    Hypercarbia is the retention of carbon dioxide. App. 26 (Renn Tr. at 25).

[6]    Treatment notes reported that he smoked one package daily since age twelve, ending in the 1980s. Ex. 4 at 33; Ex. 6 at 22.

Treatment notes from 2002 to 2010, did not document the presence of any respiratory or pulmonary disease, let alone a disabling one. Those notes disclosed knee and ankle problems, hypertension, obesity, obstructive sleep apnea, mixed hyperlipidemia, BPH with obstruction and post-operative left pulmonary embolism, a stroke that resulted in permanent left-sided hemiparesis, acute sinusitis, and a fractured elbow and wrist. Ex. 4 at 4, 33, Ex. 6-2, Ex. 6-3. The only mention of COPD occurred in December 2003, when Mitchell underwent right knee replacement surgery. He had "a little bronchospasm" which resolved with inhalers. Ex. 6 at 6. The discharge summary included a diagnosis of "Ex-smoker," and "Mild chronic obstructive pulmonary disease." Ex. 6 at 4.

## IV.    SUMMARY OF ARGUMENT

It is well established that to constitute substantial evidence, a medical opinion must be both documented and reasoned. This decision in this case raises two questions. First, whether the responsibility for providing the reasoning for a doctor's opinion rests with the doctor or with the ALJ and, second, whether consistency with preamble can provide a valid reason to credit or discredit medical opinions in an individual claim.

Mitchell had multiple risk factors for his disabling condition—his coal mine employment of thirteen years, cigarette smoking for twenty-nine years, heart disease, obesity and the residual effects of a stroke. The ALJ credited the opinion of a doctor who, relying on an vastly inflated history of coal mine employment and an invalid pulmonary function study, declared that the claimant's pulmonary impairment was due to cigarette smoking and coal mine employment. That is all the doctor said. He gave no explanation for that conclusion. He did not refer to any particular test. He cited no literature or any other support. Nor did he refer to any other potential source of disability presented in the case. Under most

circumstances, this "bottom-line" conclusion of the doctor would not be sufficient to constitute a reasoned and documented medical opinion. The opinion could not have been admitted as evidence following <u>Daubert v. Merrill Dow Pharms., Inc.</u>, 509 U.S. 579 (1993). As this Court has stated: "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." <u>Mid-State Fertilizer Co. v. Exchange Nat'l Bank</u>, 877 F.2d 1333, 1339 (7th Cir. 1989).

Here, however, the ALJ credited the doctor's opinion, based not on the strength of the opinion, its support in the underlying record, the sophistication of the doctor's explanation or even the doctor's expertise. Instead, the ALJ believed that the preamble to regulations promulgated by the Department of Labor in 2000, provided the explanation that was otherwise missing from the doctor's opinion both with respect to the cause of Mitchell's pulmonary disease and the cause of his disability for work. The ALJ's preference is not justified either in the record of this case or anywhere else. The preamble is not evidence. It is not science. And, it is not a rule. Nor does it establish scientifically valid criteria that may be applied in an adjudication.

The preamble provides an explanation for the Department's decision to promulgate its regulations, but it does not—and cannot—establish causation in an individual case. If it could, then the presumption would swallow the regulation. It would permit entitlement in the absence of sound science and would violate the Supreme Court's precedent concerning the use of preambles that have not had the benefit of notice-and-comment rulemaking, and the application of rules when the basis has proven not to be true in the run of cases. *See* <u>Wyeth v. Levine</u>, 555 U.S. 555 (2009); <u>Ragsdale v. Wolverine World Wide, Inc.</u>, 535 U.S. 81 (2002). Although this Court and others have held that an ALJ may look to the Department's preamble for guidance, no court has held that the preamble may supplant a medical

expert's obligation to provide a reasoned opinion or an explanation for his or her conclusion in an individual case.  And, whether or not resort to the preamble is optional, no court has held that where the ALJ chooses to look to the preamble, he or she may apply it as outcome-determinative.

The ALJ's decision is not supported by substantial evidence in the record, or any reliable and probative evidence, as required by the Administrative Procedure Act, 5 U.S.C. § 556(d).  It is supported solely by the ALJ's misinterpretation of risk data in the preamble which is out of date and incompetent to support a finding in an APA proceeding.

## V.     ARGUMENT

### A.     Applicable Standard of Review

This Court's role on review is well-defined.  The Court reviews an ALJ's decision to determine if it is rational, supported by substantial evidence, and consistent with controlling law.  Old Ben Coal Co. v. Dir., Office of Workers' Comp. Programs, 62 F.3d 1003, 1006 (7th Cir. 1995); Blakley v. Amax Coal Co., 54 F.3d 1313, 1318 (7th Cir. 1995).  Although the Court does not review the evidence *de novo*, it must review the record to insure that the ALJ has considered all of the relevant evidence and has rendered a decision that complies with applicable law, including the Administrative Procedure Act.  Id.; Peabody Coal Co. v. Hale, 771 F.2d 246, 249 (7th Cir. 1985).  The Court then considers the Board's decision to determine whether the Board adhered to its scope of review or whether the Board itself committed errors of law.  A failure by either the ALJ or the Board to apply the correct legal standard presents a question of law.  This Court has plenary authority to decide questions of law.  Peabody Coal Co. v. Vigna, 22 F.3d 1388, 1393 (7th Cir. 1994).

### B.   An Unreasoned Opinion Is Not Proof of Any Element of Entitlement

In any claim for black lung benefits, the proof must establish that the miner had pneumoconiosis and was totally disabled due to it.  30 U.S.C. § 901(a).  The Department of Labor's regulations identify two types of pneumoconiosis: "Clinical or medical" pneumoconiosis, defined as the form of the disease recognized by the medical community that may be diagnosed by x-ray, biopsy or autopsy (20 C.F.R. §§ 718.202(a), 718.304), and "legal" pneumoconiosis, a concept described as "a legal fiction," (Sunny Ridge Mining Co., Inc. v. Keathley, 773 F.3d 734, 739 (6th Cir. 2014), defined by DOL's regulations as "any chronic lung disease or impairment and its sequelae arising out of coal mine employment" (20 C.F.R. § 718.201(a)(2)).  The term "arising out of coal mine employment" is defined as "any chronic pulmonary disease or respiratory or pulmonary impairment significantly related to, or substantially aggravated by, dust exposure in coal mine employment."  20 C.F.R. § 718.201(b).  Legal pneumoconiosis may be diagnosed by medical opinion "if a physician, exercising sound medical judgment, notwithstanding a negative X-ray, finds that the miner suffers or suffered from pneumoconiosis as defined in § 718.201."  20 C.F.R. § 718.202(a)(4).  Once pneumoconiosis and total disability are established, the proof must establish disability causation, *i.e.,* that pneumoconiosis substantially contributed to the claimant's disability.  Here too, the regulations provide the required showing.  20 C.F.R. § 718.204(c).  The proof must establish that pneumoconiosis: "(i) Has a material adverse effect on the miner's respiratory or pulmonary condition; or (ii) Materially worsens a totally disabling respiratory or pulmonary impairment which is caused by a disease or exposure unrelated to coal mine employment."  Id.

In this case, the ALJ concluded that Mitchell did not have clinical pneumoconiosis.  The dispute focused on whether he had legal pneumoconiosis and

whether his disability was due to it.  This Court's decisions address both the type of evidence required to establish a fact and the standard of proof that must be satisfied.  As a threshold matter, this Court has held that an opinion which provides no reasons, does not discuss the underlying evidence or documentation, does not point to epidemiologic studies or cite a single article in the medical literature is "worthless" and does "not help the decisionmaker."  Zeigler Coal Co. v. Dir., Office of Workers' Comp. Programs, 213 F.3d 332, 335-36 (7th Cir. 2002).  See also Zenith Elecs. Corp. v. WH-TV Broad. Corp., 395 F.3d 416, 419 (7th Cir. 2005) ("Scientific decisions must be made by scientific rather than rhetorical means....  But even a lawyer knows enough to insist that experts follow scientific approaches normal to their disciplines....  An expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable.") (citations omitted); Huey v. United Parcel Serv., Inc., 165 F.3d 1084, 1087 (7th Cir. 1999) ("an expert must substantiate his opinion; providing only an ultimate conclusion with no analysis is meaningless"); Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago, 877 F.2d at 1339 ("Professor Bryan presented nothing but conclusions – no facts, no hint of an inferential process, no discussion of hypotheses considered and rejected....  An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.").  See also In Re Grand Jury Subpoena dated Jan. 4, 1984, 750 F.2d 223, 225 (2d Cir. 1984) (a party's burden of establishing facts that are the essential elements of a claim, is not "discharged by mere conclusory or ipse dixit assertions.").

Here, Mitchell's impairment is connected to his coal dust exposure only by the ipse dixit of Dr. Houser's opinion.  When it came to the etiology of his cardiopulmonary diagnosis, Dr. Houser provided nothing more than a bare conclusion that Mitchell's COPD was "secondary to former cigarette smoking and to

exposure of coal and rock dust arising from coal mine employment." App. 11. He did not provide any reasoning to support that conclusion. He did not refer to any of the tests conducted at his request. He did not refer to any clinical findings from his examination. He did not refer to any other conditions that he considered and rejected as a source of Mitchell's cardiopulmonary condition. He did not identify any medical literature he relied on or epidemiology or even cite to his expertise or experience as a basis for his conclusion. He did not identify the method he used to reach his conclusion. Nor did he conclude that Mitchell's coal dust exposure significantly contributed to or substantially aggravated Mitchell's COPD or that his coal dust exposure had a material adverse effect in causing his respiratory or pulmonary disability. Reliance on his opinion cannot be reconciled with this Court's decisions that expert opinions without explanations are "worthless, or "meaningless" and "provide nothing of value to the judicial process." Dr. Houser's opinion that Mitchell's COPD and, implicitly, his disability was due to coal dust exposure and cigarette smoking did not depend on any particular findings in Mitchell's case.

Even if the doctor's opinion could somehow be construed to be based on the results of his history, examination and diagnostic testing, the ALJ still erred in accepting his opinion. When an expert provides the facts or reasons supporting his or her opinion, and those reasons are not accurate, this Court—and others—have held that the opinion cannot be credited automatically:

> When a witness relies for his conclusion on facts *A, B,* and *C,* and fact *A* is knocked out, it does not follow that his conclusion must change. It may be that his conclusion would be unchanged as long as two out of the three facts, or even just one of the three facts, were true. If this is plain there is no need to ask him to reconsider in light of the altered premise (not-*A* in place of *A*); but if it is not plain, then one must ask him to reconsider.

Sahara Coal Co. v. Fitts, 39 F.3d 781, 783 (7th Cir. 1994). *See also* Creech v. Benefits Review Bd., 841 F.2d 706, 709 (6th Cir. 1988) (where a doctor's opinion was based on an inaccurate work history, "the ALJ was entitled to conclude that the opinion was not 'reasoned' as required by the regulation."); Risher v. OWCP, 940 F.2d 327, 331 (8th Cir. 1991) ("An ALJ may discount a doctor's opinion where that opinion is based on an incorrect view of the claimant's medical history…"); Greene v. King James Coal Mining, Inc., 575 F.3d 628, 635 (6th Cir. 2009)(" The ALJ permissibly discounted Dr. Baker's reference to coal dust exposure because it was premised upon inaccurate accounts of Greene's coal mine employment and smoking history."); *Cf.* Walker v. Soo Line R.R. Co., 208 F.3d 581, 586-87 (7th Cir. 2000) (when a medical expert has "relied upon a patient's self-reported history and that history is found to be inaccurate, district courts usually should allow those inaccuracies in that history to be explored through cross-examination.").

Here, the only mention of Mitchell's coal mine employment in Dr. Houser's report was his notation that Mitchell worked as a miner for twenty-six years, when the record disclosed that Mitchell worked thirteen years. App. 7. The only mention of obstructive lung disease in Dr. Houser's opinion was a reference to the pulmonary function study that the doctor himself deemed to be invalid. App. 6, 11. Although Dr. Houser reported mild hypoxemia and mild hypercapnia on blood gas tests, he did not attribute any disability to that condition, let alone identify the source.[7] Dr. Repsher found the blood gas test results were consistent with Mitchell's Pickwickian Syndrome and his morbid obesity. Dr. Renn attributed the finding to tobacco smoking. And, the only remarkable clinical findings mentioned by Dr. Houser were Mitchell's obesity, edema, diminished breath sounds and limited mobility on

---

[7]     Those conditions would not in any case be caused by employment-related COPD.

14

account of his multiple orthopedic problems. Other doctors attributed Mitchell's diminished breath sounds and edema to his obesity. Dr. Houser, however, did not account for the impact of Mitchell's obesity, or stroke or any other health condition.

The ALJ overlooked all of these shortcomings even though an inaccurate work history casts doubt on a doctor's conclusion, Creech, 841 F.2d at 709, an invalid pulmonary function test proves nothing at all, Peabody Coal Co. v. Director, OWCP, 972 F.2d 880 (7th Cir. 1992); Zeigler Coal Co. v. Sieberg, 839 F.2d 1280 (7th Cir.1988). and in rendering a valid differential etiology, a doctor must, at a minimum consider all potential risk factors and explain why one is more likely than another, Myers v. Ill. Central R. Co., 629 F.3d 639, 644 (7th Cir. 2010); Tamraz v. Lincoln Elec. Co, 620 F.3d 665, 673-74 (6th Cir. 2010), cert. denied, 131 S.Ct. 2454 (2011); Milburn Colliery Co. v. Hicks, 138 F.3d 524, 534 (4th Cir. 1998) (the record must do more than pay mere "lip service" to the impact of a claimant's other health problems). Mitchell submitted no evidence rehabilitating the doctor's opinion and other than his assertion as to the etiology of Mitchell's COPD, Dr. Houser provided no explanation why he might have considered one source of pulmonary impairment or disability more likely than another. As this Court recognized, "the law demands more than a casual diagnosis that a doctor may offer a friend or acquaintance outside the office about what could be causing his aches and pains." Myers, 629 F.3d at 644. It demands more than an assumption or a guess, even a scientific one, based on general causation. *Id.* at 645; Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 319 (7th Cir 1996) ("the courtroom is not the place for scientific guesswork, even of the inspired sort.").[8]

---

[8]     That the Court's analysis was made in the context of a decision to exclude evidence under Daubert v. Merrill Dow Pharms., Inc., 509 U.S. at 593, provides no basis for a different analysis under the Administrative Procedure Act. This Court and others have recognized that the ALJ also must act as a gatekeeper in order to insure the consideration of reliable, probative and substantial evidence. See Peabody Coal Co. v. McCandless, 255 F.3d 465 (7th Cir. 2001); U.S. Steel Mining

The doctor's opinion does not meet the bare minimum of substantial evidence or reliability. The ALJ erred in relying on Dr. Houser's opinion and without it, Mitchell has no proof.

C.   The ALJ Erred in Relying on the Preamble to Supply the Reasoning Missing from Dr. Houser's Opinion

It is beyond dispute that Mitchell bears the burden of proving his entitlement by a preponderance of the evidence. <u>Dir., Office of Workers' Comp. Programs v. Greenwich Collieries</u>, 512 U.S. 267 (1994). Other than a rebuttable presumption that a claimant's clinical pneumoconiosis arose out of his or her coal mine employment where the claimant has worked ten or more years, no presumptions assist. Preambles cannot augment incompetent evidence or supply a rationale for a witness's failure to explain or document a conclusion.

In Mitchell's case, the ALJ, not Mitchell, attempted to shore up proof that was not otherwise competent to establish Mitchell's entitlement. That effort was beyond the ALJ's role under the APA. The courts of appeals have long recognized that a judge may not assume the role of an advocate. *See, e.g.*, <u>United States v. Barnhart,</u> 599 F.3d 737, 743 (7th Cir. 2010) ("the judge may not 'assume the role of an advocate for either side …"); <u>United States v. Martin</u>, 189 F.3d 547, 553 (7th Cir. 1999); <u>Stafford v. Ford Motor Co.</u>, 790 F.2d 702, 706 (8th Cir. 1986) (same). That includes adding to evidence in the record. As Chief Justice Hughes stated, the judge must conduct a trial "in conformity with the standards governing the judicial

---

<u>Co., Inc. v. Director, OWCP</u>, 187 F.3d 384 (4th Cir. 1999). *See also* <u>Niam v. Ashcroft</u>, 354 F.3d 652, 660 (7th Cir. 2004) ("the spirit of <u>Daubert</u>, … does apply to administrative proceedings. … 'Junk science' has no more place in administrative proceedings than in judicial ones."). *See also* Paul S. Miller & Bert W. Rein, "'Gatekeeping' Agency Reliance on Scientific and Technical Materials After Daubert: Ensuring Relevance and Reliability in the Administrative Process," 17 TOURO L.REV. 297 (2000).

office," he "may analyze and dissect the evidence, but he may not either distort it or add to it." Quercia v. United States, 289 U.S. 466, 470 (1933). The Benefits Review Board's case law accords with this principle. *See* Maddaleni v. The Pittsburg & Midway Coal Mining Co., 14 Black Lung Reporter (MB) 1-135, 1-140 (Benefits Review Bd. 1990) (holding that an ALJ is under no obligation to develop the claimant's case), aff'd, 961 F.2d 1524 (10th Cir. 1992). The ALJ's reliance on the preamble to add the missing explanation in Dr. Houser's report cannot be reconciled with these principles.

The ALJ's effort also is unsound as a matter of law and science. According to the ALJ, the absence of any explanation from Dr. Houser was not dispositive because his conclusion that coal dust and cigarette smoking contributed to Mitchell's obstructive lung disease was consistent with certain positions taken by the Department of Labor in the preamble or "the regulations." S.App. 30-31: ALJ D&O at 20-21. The ALJ did not identify what regulations she was relying on, but she did point to various positions expressed in the preamble—that even in the absence of smoking, coal dust exposure may be associated with clinically significant obstruction and chronic bronchitis and that the risk is additive with cigarette smoking, S.App. 30: ALJ D&O at 20, quoting 65 Fed. Reg. 79,940 (2000), that COPD may be detected from decrements in certain measures of lung function, including the $FEV_1$ and $FEV_1$/FVC ratio, S.App. 31: ALJ D&O at 21, quoting 65 Fed. Reg. 79,943 (2000), and that dust-induced emphysema and smoke-induced emphysema occur through similar mechanisms, *id.* Although the ALJ recognized that the issue of whether a claimant's disability is due to his coal mine employment or smoking must be resolved on a claim-by-claim basis with the burden on the claimant to show that his obstructive lung disease arose out of his coal mine employment, she

nevertheless announced that she "considered how to weigh the conflicting medical opinions in this case based on these principles." S.App. 31: ALJ D&O at 21.

This approach is inconsistent with law. The Supreme Court and the circuit courts have issued much guidance to agencies and the public when it comes to promulgating regulations under the Administrative Procedure Act. The Supreme Court has made it clear that when an agency's guidance, expressed in a preamble or elsewhere, has the force and effect of law, and is intended to bind the parties, it must be published for notice and comment under the APA. Wyeth v. Levine, 555 U.S. at 557 (refusing to credit the FDA's statements concerning preemption in a preamble to a 2006 regulation because, among other problems, those statements were not subject to notice and comment, stating "The agency's views on state law are inherently suspect in light of this procedural failure."); United States v. Mead Corp., 533 U.S. 218, 234-35 (2001) (holding that interpretations contained in policy statements, agency manuals, and enforcement guidelines "are beyond the *Chevron* pale"). Giving binding effect to an agency's discussion in a preamble to unambiguous regulations is not consistent with that precedent and violates the APA's guarantee of fairness both in the promulgation of regulations and in the adjudication of cases. It also violates the Black Lung Benefits Act's express requirement for APA publication of black lung regulations. 30 U.S.C. § 936(a). If, as the ALJ applies it here, the preamble significantly revises the regulations, then the regulations are invalid for this reason as well.

The ALJ's reliance on the preamble to supply reasoning for Dr. Houser's opinion also is inconsistent with any known principles of science. The preamble is not a scientific document. DOL's lawyers or administrators, not NIOSH, wrote the

preamble.[9]   The lawyers offered their interpretation of epidemiological research which, as a matter of science, is not properly used as a basis for determining causation in an individual case unless the research proved virtually 100% likelihood of causation (*e.g.*, mesothelioma and long term asbestos exposure).  *See Green, et al.*, "Reference Guide on Epidemiology," REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 549, 552 (3d ed. 2011) ("Epidemiology focuses on the question of general causation (i.e., is an agent capable of causing disease?) rather than on specific causation (i.e., did it cause disease in a particular individual?).").   "[A]n association is not equivalent to causation." *Id.*  This Court has recognized this dichotomy as well.  *See* Myers, 629 F.3d at 641-42 (recognizing the dichotomy between general causation (whether something has the capacity to cause the harm alleged, and individual or specific causation, whether a particular individual suffers from a particular ailment as a result of exposure to a particular substance).  In the preamble, however, even DOL's lawyers recognized that the risk of developing clinically significant obstructive lung disease from coal mine employment was far from 100%.  *See* 65 Fed. Reg. 79,941 ("only a minority of miners will have significant decrements in pulmonary function….   [T]he majority of miners may have small or, perhaps in some cases, no decline in pulmonary function ….").  This statement likely overstates the risk of causation.

The preamble was intended to relieve claimants of the burden of proving risk, how ever small the risk may be, but it did not relieve claimants of the burden of establishing individual causation.  65 Fed. Reg. 79,938.  Expert testimony, not the ALJ's leap of logic or statements in the preamble, is needed to establish individual causation.  Myers, 629 F.3d at 642-43 (holding that where the source of an injury is

---

[9]    Litigation following the rulemaking revealed that no pulmonary physician or scientist saw, much less approved, the preamble.  *See* Nat'l Mining Ass'n v. Dep't of Labor, 292 F.3d 849 (D.C. Cir. 2002).

not obvious to a lay person, *e.g.*, where it has no obvious origin or multiple potential etiologies, expert testimony is required); Higgins v. Koch Dev. Corp., __ F.3d __, No. 14-2207 (7th Cir. July 20, 2015) (affirming the view that without an appropriate expert, a claimant cannot establish specific causation).  The ALJ is not competent to translate epidemiologic studies into proof of causation in an individual claim.  Even an expert physician would be justified in doing so without conducting a full differential analysis of the miner's health picture.  Here, the ALJ ignored the miner's health issues and relied on the preamble as justification.

This Court's decision in Consolidation Coal Co. v. Director, OWCP [Beeler], 521 F.3d 723 (7th Cir. 2008), does not compel a different conclusion.  There, this Court affirmed an ALJ's reliance on the discussion in the Department's preamble to discredit an opinion from a doctor who seemed to disagree with DOL's conclusion with respect to general causation.  Unlike Mitchell, Mr. Beeler's only medical condition was severe lung disease.  Beeler, 521 at 724.  The evidence addressing the source of Mr. Beeler's lung disease—whether it was due to both cigarette smoking and coal dust exposure or only to cigarette smoking—conflicted.  The ALJ resolved the conflict by relying on the opinion that he believed was better reasoned.  The employer in Beeler complained that the ALJ erred in dismissing the opinions of the doctors who identified cigarette smoking as the sole source of Beeler's problems. This Court found no error.  First, one of those opinions was a three-sentence conclusion that suggested that the doctor would never attribute any obstructive lung disease to coal dust exposure, a view that was contrary to the position accepted in the preamble with respect to general causation.  As the Court noted, like Dr. Houser's opinion in this case, the doctor "did not cite a single article in the medical literature to support his propositions," and he "did not appear to analyze any data or observations specific to Beeler." *Id.* at 726.  The second opinion also was similar

to Dr. Houser's opinion in this case: "The entirety of the opinion consists of a list of diagnoses followed by a statement that [the claimant's] condition was the result of his smoking, not coal dust exposure. There is no explanation or reasoning demonstrated here that links the two elements—the opinion is purely conclusory." *Id.* In contrast, the opinion credited by the ALJ was based on objective data, peer-reviewed medical literature including a review of the studies that post-dated the Department's preamble, and the doctor linked the studies with the claimant's symptoms, physical examination findings, pulmonary function studies and blood gas tests. The preamble was not dispositive in <u>Beeler</u>, but <u>Beeler</u> counsels that the decision in this case cannot be upheld.

<u>Beeler</u> provides strong support for reversing the ALJ's decision because the ALJ relied on a "purely conclusory" opinion. In contrast to <u>Beeler</u>, here, the ALJ's reliance on the preamble was dispositive. It is the sole reason for the ALJ's decision to credit Dr. Houser's conclusory opinion as well as her main decision to discredit the opinions of Drs. Repsher and Renn even though neither doctor expressed a view that was contrary to the conclusion regarding general causation expressed in the preamble. S.App. 32, 33: ALJ D&O at 22, 23. The ALJ's reliance on the preamble in this way foreordains the outcome of any case involving a former miner who smoked cigarettes and developed COPD even where, as here, the COPD might not be a principal cause of the disability. Any opinion that includes coal dust as a factor will be credited because it is consistent with the preamble and any opinion that attributes the impairment to something else will be discredited.

Nothing in the preamble requires entitlement where, as here, the claimant has several potential sources for his respiratory or pulmonary impairment. The possibility of a coal dust-related impairment or disability is not proof of legal pneumoconiosis or disability due to it. As this Court noted:

> A miner is not entitled to benefits if by reason of his heavy smoking or some other activity or condition of his that is not itself mining, he would have become totally disabled (and no later than he did) even if he had never gone near a coal mine. To award benefits in such a case would be to confer a pure windfall, since by assumption the miner was no worse off by virtue of working in a mine than he would have been had he been working in an oxygen factory. The Black Lung Benefits Act is generous, but not that generous. It is not a welfare program for cigarette smokers.

Shelton v. Director, OWCP, 899 F.2d 690, 692, 693 (7th Cir. 1990). *See also* Peabody Coal Co. v. Durbin, 165 F.3d 1126, 1128 (7th Cir. 1999) (recognizing that if the claimant is disabled, but not by pneumoconiosis, he is not entitled to benefits and therefore, the "proper question, stated more precisely, is whether, had it not been for his pneumoconiosis, [the claimant] would have been able to continue working in the mines."). More recently, the Court affirmed a decision of Benefits Review Board reversing an award of benefits when it was undisputed that the claimant was forced to stop working because of blindness, not black lung disease. Gulley v. Director, OWCP, 397 F.3d 535 (7th Cir. 2005). Even though the claimant there argued that the miner suffered from two independent disabilities, blindness and pneumoconiosis, the Court held that this theory was unavailing where there was no evidence that the claimant's presumed pneumoconiosis played any role in his inability to work. *Id.*, 397 F.3d at 539.

Here, in her zeal to apply the preamble, the ALJ overlooked the facts. Mitchell worked as a miner until 1998. Dx. 4. Pneumoconiosis did not prevent him from working at that time. In fact, he continued to work for another six years as a master electrician at a synthetic fuel plant, work which involved the same demands as his coal mine employment. Dx. 5. He retired in 2005. Dx. 4. Again, pneumoconiosis did not prevent him from working at that time either. The plant

closed and he retired, having reached age 61.  Dx. 5 at 2.  By then, he had suffered a stroke which limited his mobility, and he was morbidly obese.  But the BLBA does not compensate claimants for the effects of a stroke, <u>Peabody Coal Co. v. Vigna</u>, 22 F.3d 1388 (7th Cir. 1994) or old age, <u>Meyer v. Zeigler Coal Co.</u>, 894 F.2d 902 (7th Cir.), <u>cert. denied</u>, 498 U.S. 827 (1990), or obesity, <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524.  No doctor concluded that but for his legal pneumoconiosis, Mitchell would have been able to work.  No doctor concluded that Mitchell's exposure to coal dust substantially contributed to or significantly aggravated some other condition that combined to disable him for work.  No doctor concluded that black lung disease had a material adverse effect in causing Mitchell's disability.  Under these circumstances, the ALJ's decision to award benefits is supported by nothing at all and must be reversed.

## VI.  <u>CONCLUSION</u>

For the reasons set forth here, the decision and order of the Benefits Review Board should be vacated and the award if benefits should be reversed.

Respectfully submitted,

/s/Mark E. Solomons
Mark E. Solomons
Laura Metcoff Klaus
GREENBERG TRAURIG LLP
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
(202) 533-2361

**SHORT APPENDIX TO PETITIONER'SBRIEF**

**CIRCUIT RULE 30(d) STATEMENT**

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) is included in this Short Appendix filed with Petitioner's Brief. Counsel certifies that all material required by Circuit Rule 30(b) is included in the separately filed Appendix.


s/Laura Metcoff Klaus
Laura Metcoff Klaus

INDEX TO PETITIONER'S SHORT APPENDIX

| Item | Record Entry | Page No. |
| --- | --- | --- |
| Benefits Review Board<br>Order on Motion for Reconsideration<br>dated March 17, 2015 | R. 1 | App. 1 |
| Benefits Review Board<br>Decision and Order dated<br>December 29, 2014 | R. | App. 3 |
| Administrative Law Judge<br>Decision and Order | -- | App. 11 |

U.S. Department of Labor

Benefits Review Board
P.O. Box 37601
Washington, DC 20013-7601



BRB No. 14-0160 BLA
Case No. 2011-BLA-5133

| | | |
|---|---|---|
| THOMAS L. MITCHELL | ) | **NOT PUBLISHED** |
| | ) | |
| Claimant-Respondent | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HERITAGE COAL COMPANY | ) | DATE ISSUED: **MAR 1 7 2015** |
| | ) | |
| Employer-Petitioner | ) | |
| | ) | |
| DIRECTOR, OFFICE OF WORKERS' | ) | |
| COMPENSATION PROGRAMS, UNITED | ) | |
| STATES DEPARTMENT OF LABOR | ) | |
| | ) | |
| | ) | ORDER on |
| Party-in-Interest | ) | RECONSIDERATION |

As no member of the panel has affirmatively voted to vacate or modify the decision herein, the motion for reconsideration filed by employer is DENIED. 33 U.S.C. §921(b)(5); 20 C.F.R. §§801.301(b), 802.407(a), 802.409.

By Order of the Board:

Thomas O. Shepherd, Jr.
Clerk of the Board

## CERTIFICATE OF SERVICE

2014-0160-BLA Thomas L. Mitchell v. Heritage Coal Company, Director, Office of Workers' Compensation Programs (Case No. 11-BLA-5433)

I certify that the parties below were served this day.

MAR 1 7 2015

(DATE)

Thomas O. Shepherd, Jr., Esq.
Clerk of the Appellate Boards

Dominique V. Sinesi
U.S. Department of Labor
200 Constitution Avenue, N W
N-2119
Washington, DC 20210

Shelly Rigsby Stuthers
Southern Illinois and Southwest Indiana Disase
Program
Corporate Square
2901 E. Ohio Blvd, Suite #235
Terre Haute, IN 47803
        --Certified

Thomas L. Mitchell
2644 Smith Road
Boonville, IN 47601
        --Certified

Hon. Alice M. Craft
U.S. Department of Labor
Office of Administrative Law Judges
36 E. 7th St., Suite 2525
Cincinnati, OH 45202

Laura Metcoff Klaus, Esq.
Greenberg Traurig LLP
2101 L Street, N.W.
Suite 1000
Washington, DC 20037
        --Certified

Michael Chance
U.S. Department of Labor
Suite C-3516, NDOL
Washington, DC 20210

Rae Ellen James, Esq.
Associate Solicitor, U.S. Department of Labor
200 Constitution Avenue, N.W.
Suite N-2117, NDOL
Washington, DC 20210
        --Electronic

S.App. 2

**U.S. Department of Labor**

Benefits Review Board
P.O. Box 37601
Washington, DC 20013-7601



BRB No. 14-0160 BLA

**NOT PUBLISHED**

THOMAS L. MITCHELL                            )
                                              )
    Claimant-Respondent          )
                                              )
    v.                           )
                                              )    DATE ISSUED:    DEC 2 9 2014
HERITAGE COAL COMPANY                         )    DATE ISSUED:
                                              )
    Employer-Petitioner          )
                                              )
DIRECTOR, OFFICE OF WORKERS'                  )
COMPENSATION PROGRAMS, UNITED                 )
STATES DEPARTMENT OF LABOR                    )
                                              )
    Party-in-Interest            )    DECISION and ORDER

    Appeal of the Decision and Order Awarding Benefits of Alice M. Craft, Administrative Law Judge, United States Department of Labor.

    Shelly Rigsby Stuthers (Southwestern Indiana Respiratory Disease Program), Terre Haute, Indiana, for claimant.[1]

    Laura Metcoff Klaus (Greenberg Traurig LLP), Washington, D.C., for employer.

    Before: HALL, Acting Chief Administrative Appeals Judge, McGRANERY and BOGGS, Administrative Appeals Judges.

PER CURIAM:

    Employer appeals the Decision and Order Awarding Benefits (2011-BLA-5133) of Administrative Law Judge Alice M. Craft with respect to a claim filed on December 11, 2009, pursuant to the provisions of the Black Lung Benefits Act, as amended, 30 U.S.C. §§901-944 (2012)(the Act). The administrative law judge credited claimant with

---

    [1] In a letter to the Board in response to employer's request for an extension of time in which to file a brief, Shelly Rigsby Stuthers reported that she is a lay advocate, assisting claimant with his claim.

thirteen years of coal mine employment and adjudicated this claim pursuant to the regulations contained in 20 C.F.R. Part 718.[2]  The administrative law judge determined that, although the x-ray evidence was insufficient to establish the existence of clinical pneumoconiosis at 20 C.F.R. §718.202(a)(1), claimant established the existence of legal pneumoconiosis at 20 C.F.R. §718.202(a)(4).  The administrative law judge further found that claimant's pneumoconiosis arose out of coal mine employment at 20 C.F.R. §718.203.  The administrative law judge also determined that claimant has a totally disabling respiratory or pulmonary impairment due to pneumoconiosis under 20 C.F.R. §718.204(b)(2), (c).  Accordingly, the administrative law judge awarded benefits.

On appeal, employer argues that the administrative law judge improperly gave binding effect to the preamble to the 2001 regulations and did not properly consider the evidence at 20 C.F.R. §§718.202(a)(2), 718.203(b), and 718.204(c).  Claimant responds, urging affirmance of the award of benefits.  The Director, Office of Workers' Compensation Programs, has not filed a response brief in this appeal.[3]

The Board's scope of review is defined by statute. The administrative law judge's findings must be affirmed if they are rational, supported by substantial evidence, and in accordance with applicable law.[4]  33 U.S.C. §921(b)(3), as incorporated by 30 U.S.C. §932(a); *O'Keeffe v. Smith, Hinchman & Grylls Associates, Inc.*, 380 U.S. 359 (1965).

In order to establish entitlement to benefits under 20 C.F.R. Part 718, claimant must establish that he has pneumoconiosis, that the pneumoconiosis arose out of coal

---

[2]  Amended Section 411(c)(4) of the Act provides a presumption that a miner is totally disabled due to pneumoconiosis if he or she establishes at least fifteen years of underground coal mine employment, or coal mine employment in conditions substantially similar to those in an underground mine, and a totally disabling respiratory or pulmonary impairment. 30 U.S.C. §921(c)(4), as implemented by 20 C.F.R. §718.305. Amended Section 411(c)(4) does not apply in this case, because claimant did not establish at least fifteen years of qualifying coal mine employment. *Id.*; Decision and Order at 6.

[3]  We affirm, as unchallenged on appeal, the administrative law judge's determination that claimant established total disability at 20 C.F.R. §718.204(b)(2). *See Skrack v. Island Creek Coal Co.*, 6 BLR 1-710 (1983).

[4]  The record reflects that claimant's coal mine employment was in Indiana. Director's Exhibits 4, 7. Accordingly, this case arises within the jurisdiction of the United States Court of Appeals for the Seventh Circuit. *See Shupe v. Director, OWCP*, 12 BLR 1-200 (1989) (en banc).

2

mine employment, and that the pneumoconiosis is totally disabling. 20 C.F.R. §§718.3, 718.202, 718.203, 718.204; *Gee v. W.G. Moore & Sons*, 9 BLR 1-4 (1986) (en banc). Failure to establish any one of these elements precludes entitlement. *See Trent v. Director, OWCP*, 11 BLR 1-26 (1987); *Perry v. Director, OWCP*, 9 BLR 1-1 (1986) (en banc).

Pursuant to 20 C.F.R. §718.202(a)(4), the administrative law judge initially determined that claimant's treating physicians diagnosed chronic obstructive pulmonary disease (COPD), but they did not identify its cause. Decision and Order at 21. The administrative law judge then considered the medical opinions of Drs. Houser, Repsher and Renn. The administrative law judge stated that she construed Dr. Houser's diagnosis of a moderately severe obstructive impairment due to coal dust exposure and cigarette smoking, as a diagnosis of legal pneumoconiosis.[5] *Id.*; *see* Director's Exhibit 11. The administrative law judge determined that Dr. Houser's opinion was documented and reasoned, and gave it "probative weight." Decision and Order at 21. In contrast, the administrative law judge gave "little weight" to Dr. Repsher's opinion, that claimant's COPD was caused by his cigarette smoking, because Dr. Repsher "did not offer any creditable explanation why he excluded coal dust as a contributing factor to [claimant's] obstructive disease." *Id.*; *see* Director's Exhibit 26. The administrative law judge also discredited Dr. Repsher's opinion on the ground that it was "not consistent with the premises underlying the regulations." Decision and Order at 22. Similarly, the administrative law judge gave less weight to Dr. Renn's opinion, that coal dust exposure was not a contributing factor to claimant's impairment, because she found that Dr. Renn also relied on premises at odds with the regulations and failed to provide "any creditable reason" why coal dust exposure did not contribute to claimant's impairment. *Id.* at 23; *see* Employer's Exhibit 1.

The administrative law judge concluded that the opinion of Dr. Houser outweighed the contrary opinions of Drs. Repsher and Renn and, therefore, was sufficient to establish the existence of legal pneumoconiosis at 20 C.F.R. §718.202(a)(4). Decision and Order at 23. Based on the administrative law judge's weighing of the evidence at 20 C.F.R. §718.202(a)(4), she found that claimant established that his pneumoconiosis arose out of coal mine employment at 20 C.F.R. §718.203. *Id.* at 23-24.

Employer argues that the "[administrative law judge's] decision raises questions as to her impartiality or ability to provide 'just' proceedings," as previous decisions of hers, awarding benefits, "contain identical language that reflect the [administrative law

---

[5] Pursuant to 20 C.F.R. §718.201(a)(2), legal pneumoconiosis includes "any chronic lung disease or impairment and its sequelae arising out of coal mine employment." 20 C.F.R. §718.201(a)(2).

3

judge's] view of the Department of Labor's preamble, a view that precludes any meaningful defense of a black lung claim." Employer's Brief at 12-13. Employer also contends that the administrative law judge improperly gave the preamble to the 2001 regulations the effect of law when weighing the medical opinion evidence. Employer further alleges that the administrative law judge improperly relied on the preamble to find that Dr. Houser's opinion, diagnosing legal pneumoconiosis, was adequately reasoned and entitled to greater weight than the contrary opinions of Drs. Repsher and Renn. Additionally, employer asserts that the administrative law judge did not accurately characterize Dr. Renn's comments regarding the results of a pulmonary function study. Employer further contends that the administrative law judge erred in relying on the presumption at 20 C.F.R. §718.203(b) to find that claimant's pneumoconiosis arose out of his coal mine employment,[6] as that presumption only applies to establishing the causal connection between coal mine employment and clinical pneumoconiosis.[7]

Employer's allegations of error do not have merit. The Board has held that a party alleging bias or prejudice on the part of the administrative law judge has a heavy burden to satisfy. *See Cochran v. Consolidation Coal Co.*, 16 BLR 1-101, 1-107-08 (1992). Employer's mere citation of the number of cases in which the administrative law judge has awarded benefits, and used language that is identical, or similar, to the language used by the administrative law judge in this case does not satisfy this burden. *See Marcus v. Director, OWCP*, 548 F.2d 1044, 1050 (D.C. Cir. 1976); *Zamora v. C. F. & I. Steel Corp.*, 7 BLR 1-568 (1984).

Furthermore, contrary to employer's contention, the administrative law judge did not give binding effect to the preamble, or rely on it to credit Dr. Houser's opinion without considering whether his diagnosis of legal pneumoconiosis was reasoned. Rather, the administrative law judge acted within her discretion in consulting the preamble as a statement of the medical evidence found credible by the Department of Labor (DOL) when it revised the definition of pneumoconiosis to include obstructive impairments arising out of coal mine employment. *See Zeigler Coal Co. v. OWCP*

---

[6] Under 20 C.F.R. §718.203(b), there is a rebuttable presumption that the miner's pneumoconiosis arose out of coal mine employment if the presence of pneumoconiosis is established and the miner has at least ten years of coal mine employment. 20 C.F.R. §718.203(b).

[7] Clinical pneumoconiosis consists of "those diseases recognized by the medical community as pneumoconiosis, *i.e.*, the conditions characterized by permanent deposition of substantial amounts of particulate matter in the lungs and the fibrotic reaction of the lung tissue to that deposition caused by dust exposure in coal mine employment." 20 C.F.R. §718.201(a)(1).

S.App. 6

[*Griskell*], 490 F.3d 609, 24 BLR 2-38 (7th Cir. 2007); *Midland Coal Co. v. Director, OWCP* [*Shores*], 358 F.3d 486, 23 BLR 2-18 (7th Cir. 2004); *Freeman United Coal Mining Co. v. Summers*, 272 F.3d 473, 483 n.7, 22 BLR 2-265, 2-281 n.7 (7th Cir. 2001).

In addition, the administrative law judge acted within her discretion as fact-finder in determining that Dr. Houser's opinion was reasoned. *See Consolidation Coal Co. v. Director, OWCP* [*Beeler*], 521 F.3d 723, 24 BLR 2-97 (7th Cir. 2008). A reasoned medical opinion is one that is supported by underlying documentation. *See Fields v. Island Creek Coal Co.*, 10 BLR 1-19 (1987). As the administrative law judge noted, Dr. Houser examined claimant on April 26, 2010, and obtained a chest x-ray, pulmonary function study, a blood gas study, and an electrocardiogram, in addition to claimant's work and medical histories. Director's Exhibit 11; *see* Decision and Order at 14. Dr. Houser stated that claimant's chest x-ray was negative for clinical pneumoconiosis, while his pulmonary function study showed moderately severe airway obstruction with moderate bronchodilator response. Director's Exhibit 11. Dr. Houser diagnosed moderately severe COPD, "secondary to former cigarette smoking and to exposure [to] coal and rock dust arising from coal mine employment." *Id.* Based on the documentation contained in Dr. Houser's report of his examination of claimant, the administrative law judge permissibly credited Dr. Houser's diagnosis of legal pneumoconiosis as reasoned.[8] *See Poole v. Freeman United Coal Mining Co.*, 897 F.2d 888, 13 BLR 2-348 (7th Cir. 1990); *Amax Coal Co. v. Burns*, 855 F.2d 499 (7th Cir. 1988).

The administrative law judge also acted within her discretion in according less weight to the opinions of Drs. Repsher and Renn, that claimant does not have legal pneumoconiosis, at 20 C.F.R. §718.202(a)(4).[9] The administrative law judge permissibly

---

[8] Employer alleges that Dr. Houser's opinion was "merely an assertion" and, therefore, like the physician's opinion in *Freeman United Coal Mining Co. v. Cooper*, 965 F.2d 443, 16 BLR 2-74 (7th Cir. 1992), it could not constitute a reasoned medical opinion. Employer's Brief at 21. However, in *Cooper*, the physician's opinion consisted of a brief letter and it was not clear whether the physician had relied on any clinical tests or reviewed any evidence in forming his opinion. *Cooper*, 965 F.2d at 449, 16 BLR at 2-80-81. In contrast, Dr. Houser reviewed claimant's medical history, conducted a physical examination and performed diagnostic testing. Director's Exhibit 11.

[9] We note that the regulatory definition of legal pneumoconiosis encompasses diseases or impairments "significantly related to, or substantially aggravated by" coal dust exposure. 20 C.F.R. §718.201(b); *see also* 20 C.F.R. §718.201(a)(2). Thus, a miner may be found to have legal pneumoconiosis when coal dust exposure is not the only factor in his chronic obstructive pulmonary disease.

discredited Dr. Repsher's opinion, that claimant's reduced FEV1/FVC ratio indicated that claimant's impairment is not due to coal dust exposure, as she rationally found it was inconsistent with the regulation's use of the FEV1/FVC ratio to establish total disability. *See A & E Coal Co. v. Adams*, 694 F.3d 798, 25 BLR 2-203 (6th Cir. 2012); *J.O. [Obush] v. Helen Mining Co.*, 24 BLR 1-117, 1-125-26 (2009), *aff'd Helen Mining Co. v. Director, OWCP [Obush]*, 650 F.3d 248, 24 BLR 2-369 (3d Cir. 2011); 65 Fed. Reg. 79,943 (Dec. 20, 2000). In addition, the administrative law judge permissibly gave less weight to Dr. Renn's opinion, as she found that he relied on the reversibility of claimant's impairment without addressing the totally disabling impairment that remained, even after the administration of bronchodilators.[10] *See Poole*, 897 F.2d at 895, 13 BLR at 2-355; *Burns*, 855 F.2d at 501. Therefore, we affirm the administrative law judge's determination that claimant established the existence of legal pneumoconiosis at 20 C.F.R. §718.202(a)(4).

We also affirm the administrative law judge's finding, based on her crediting of Dr. Houser's opinion under 20 C.F.R. §718.202(a)(4), that claimant established that his pneumoconiosis arose out of coal mine employment. *See Kiser v. L&J Equipment Co.*, 23 BLR 1-146, 1-159, n.18 (2006); Decision and Order at 23. Accordingly, employer is incorrect in alleging that the administrative law judge erred in relying on the presumption set forth in 20 C.F.R. §718.203(b).

At 20 C.F.R. §718.204(c), the administrative law judge noted that both Dr. Houser and Dr. Renn opined that claimant is totally disabled by his COPD, while Dr. Repsher attributed claimant's total disability to obesity-related conditions, including congestive heart failure. Decision and Order at 25; Director's Exhibits 11, 26; Employer's Exhibit 1. The administrative law judge indicated that Dr. Repsher's opinion was entitled to little weight, because she had discredited his diagnosis of congestive heart failure, and he failed to explain why claimant's obstructive impairment did not contribute to the presence of excess carbon dioxide in his blood. Decision and Order at 25. The administrative law judge discredited Dr. Renn's opinion, that coal dust exposure played no role in causing claimant's totally disabling COPD because, contrary to the administrative law judge's finding, Dr. Renn stated that claimant does not have legal pneumoconiosis. Decision and Order at 25, *citing Toler v. Eastern Associated Coal Corp.*, 43 F.3d 109, 116, 19 BLR 2-70, 2-83 (4th Cir. 1995). The administrative law judge concluded that claimant "established that his disability was caused by

---

[10] As the administrative law judge provided valid rationales for discrediting the opinions of Drs. Repsher and Renn, we need not address the rest of employer's arguments concerning the administrative law judge's weighing of their opinions. *See Kozele v. Rochester & Pittsburgh Coal Co.*, 6 BLR 1-378 (1983).

pneumoconiosis within the meaning of the statute and regulations, based on the opinion of Dr. Houser." Decision and Order at 26.

Employer argues that "the [administrative law judge's] sole reason for discrediting the opinions of Drs. Renn and Repsher on disability causation . . . was her reliance on *Toler* . . . ." Employer's Brief at 24. Employer maintains that the present case is actually more like the situation in *Dehue Coal Co. v. Ballard*, 65 F.3d 1189, 19 BLR 2-304 (4th Cir. 1995), where the United States Court of Appeals for the Fourth Circuit held that "a medical opinion that acknowledges the miner's respiratory or pulmonary impairment, but nevertheless concludes that an ailment other than pneumoconiosis caused the miner's total disability, is relevant because it directly rebuts the miner's evidence that pneumoconiosis contributed to his disability." Employer's Brief at 25, *quoting Ballard*, 65 F.3d at 1193, 19 BLR at 2-315-16. Employer also alleges that the administrative law judge erred in discrediting Dr. Repsher's diagnosis of congestive heart failure, as contrary to her finding, the treatment records document a history of congestive heart failure beginning in 2002.

Employer's contentions are without merit. The administrative law judge's decision to discredit Dr. Repsher's causation opinion, because his diagnosis of congestive heart failure was not supported by the record, is rational and supported by substantial evidence.[11] *See Poole*, 897 F.2d at 893-94, 13 BLR at 2-355-56. In addition, the administrative law judge determined correctly that Dr. Renn's opinion, that claimant's totally disabling COPD was unrelated to coal dust exposure, conflicted with her finding that claimant has legal pneumoconiosis, i.e., "a chronic pulmonary disease . . .

---

[11] Employer identifies page 4 of Employer's Exhibit 4 as the evidence establishing that Dr. Fletcher, claimant's treating physician, diagnosed congestive heart failure. Employer's Brief at 23. Page 4 of Employer's Exhibit 4 is a document entitled "List of Problems" that primarily contains handwritten notes identifying the medical conditions diagnosed during claimant's visits to Dr. Fletcher. Employer's Exhibit 4 at 4. The only entry that appears to refer to congestive heart failure is dated May 2002 and consists of the abbreviations "HTN" and "CHF," separated by the small letter "s" with a line over it. *Id.* Employer does not explain how this entry constitutes a diagnosis of congestive heart failure. The remainder of Employer's Exhibit 4 includes a number of treatment notes referring to "HTN," with no accompanying reference to "CHF." *Id.* at 8, 9, 13, 14, 17, 18, 32, 67. In Dr. Fletcher's reports of claimant's visits on April 6, 2004, April 14, 2005, and May 18, 2005, he indicated that claimant has "HTN w/o CHF." *Id.* at 34, 37, 40. Dr. Fletcher's reports from October 25, 2005, April 25, 2006, June 7, 2006, December 11, 2006, June 18, 2007, December 17, 2007, June 23, 2008, January 5, 2009, July 7, 2009, and June 2, 2010, include the abbreviations and the symbol used in the report of claimant's May 2002 visit. *Id.* at 41, 44, 46-48, 52, 57, 61, 67, 70.

7

significantly related to, or substantially aggravated by dust exposure in coal mine employment." 20 C.F.R. §718.201(c); Decision and Order at 23; Employer's Exhibit 1. Thus, the administrative law judge properly discounted Dr. Renn's opinion on the issue of total disability causation because he did not diagnose the form of pneumoconiosis that the administrative law judge determined was established under 20 C.F.R. §718.202(a).[12]  *See Amax Coal Co. v. Director, OWCP* [*Chubb*], 312 F.3d 882, 22 BLR 2-514 (7th Cir. 2002); *Toler,* 43 F.3d at 116, 19 BLR at 2-83; *Peabody Coal Co. v. Shonk,* 906 F.2d 264 (7th Cir. 1990).   We affirm, therefore, the administrative law judge's determination that claimant established total disability due to pneumoconiosis pursuant to 20 C.F.R. §718.204(c), and further, affirm the award of benefits.

---

[12] This rationale also applies to Dr. Repsher's causation opinion, based on the administrative law judge's determination that he did not diagnose legal pneumoconiosis. *See Amax Coal Co. v. Director, OWCP* [*Chubb*], 312 F.3d 882, 22 BLR 2-514 (7th Cir. 2002); Director's Exhibit 26.

8

Accordingly, the administrative law judge's Decision and Order Awarding Benefits is affirmed.

SO ORDERED.


BETTY JEAN HALL, Acting Chief
Administrative Appeals Judge


REGINA C. McGRANERY
Administrative Appeals Judge


JUDITH S. BOGGS
Administrative Appeals Judge

**U.S. Department of Labor**    Office of Administrative Law Judges
36 E. 7th St., Suite 2525
Cincinnati, Ohio 45202

(513) 684-3252
(513) 684-6108 (FAX)



**Issue Date: 24 January 2014**

Case No.:    **2011-BLA-5133**

THOMAS L. MITCHELL,
    Claimant,

    v.

HERITAGE COAL CO., formerly known as
PEABODY COAL CO.,
    Employer,

    and

DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS,
    Party-in-Interest.

Appearances:

    Shelly Rigsby
    Lay Advocate
    Southern Illinois and Southwest Indiana Respiratory Disease Program
    Terre Haute, Indiana
        For the Claimant

    Richard H Risse, Esq.
    White & Risse, L.L.P.
    Arnold, Missouri
        For the Employer

    Kevin M. Wilemon, Esq.
    U.S. Department of Labor
    Office of the Solicitor
    Chicago, Illinois
        For the Director, OWCP

Before:      Alice M. Craft
            Administrative Law Judge

## DECISION AND ORDER AWARDING BENEFITS

This proceeding arises from a claim for benefits under the Black Lung Benefits Act.[1] The Act and implementing regulations[2] provide compensation and other benefits to living coal miners who are totally disabled due to pneumoconiosis and their dependents; and to surviving dependents of coal miners determined to be eligible for benefits at the time of death, or whose death was due to pneumoconiosis. The Act and regulations define pneumoconiosis, commonly known as black lung disease, as a chronic dust disease of the lungs and its sequelae, including respiratory and pulmonary impairments arising out of coal mine employment.[3] In this case, the Claimant alleges that he is totally disabled by pneumoconiosis.

The Claimant requested that I issue a decision on the record without holding a hearing. The other parties consented to the Claimant's request. On March 5, 2012, I issued an order granting his request and setting a schedule to complete the record. All parties were afforded a full opportunity to present evidence and argument, as provided in the Rules of Practice and Procedure before the Office of Administrative Law Judges.[4] The Director of the Office of Workers' Compensation Programs (OWCP) offered 36 exhibits ("DX"). The Claimant offered 5 exhibits ("CX"). The Employer offered 8 exhibits ("EX"). There being no objections to the exhibits, I admit DX 1–36, CX 1–5, and EX 1–8. In my order, I gave notice to the parties that I proposed to take judicial notice of physician qualifications listed on the Internet, and they did not object. All parties submitted closing arguments, and the record is now closed.

In reaching my decision, I have reviewed and considered the entire record, including all exhibits admitted into evidence unless otherwise noted below, and the arguments of the parties.

## I.     PROCEDURAL HISTORY

This is the first claim for black lung benefits by the Claimant, filed on December 28, 2009. DX 29. The District Director, OWCP, issued a proposed Decision and Order denying benefits on September 15, 2010. DX 29. The Claimant appealed on September 29, 2010. DX 30. The claim was referred to the Office of Administrative Law Judges ("OALJ") for hearing on November 15, 2010. DX 34. While the claim was pending before OALJ, the Employer filed a motion to hold it in abeyance to await final disposition of litigation challenging the constitutionality of the Patient Protection and Affordable Care Act. The Director, OWCP, opposed the motion. I denied the motion in an order issued on May 24, 2011.

## II.    APPLICABLE STANDARDS

This claim was filed after January 19, 2001. For this reason, the current regulations at 20 C.F.R. Parts 718 and 725 apply.[5] In order to establish entitlement to benefits under Part 718, the Claimant must establish that he suffers from pneumoconiosis, that his pneumoconiosis arose out of his coal mine employment, and that his pneumoconiosis is totally disabling.[6] Because the

---

[1] 30 U.S.C. § 901, *et seq.* (2011).
[2] 20 C.F.R. Parts 718 and 725 (2013), as amended at 78 Fed. Reg. 59102 *et seq.* (Sept. 25, 2013) (amendments effective October 25, 2013).
[3] 30 U.S.C. § 902(b); 20 C.F.R. § 718.201.
[4] 29 C.F.R. Part 18A.
[5] 20 C.F.R. §§ 718.2 and 725.2, 78 Fed. Reg. 59114 and 59117 (Sept. 25, 2013).
[6] 20 C.F.R. §§ 718.1, 718.202, 718.203, 718.204, and 725.103.

claim was filed after January 1, 2005, amendments to the Black Lung Benefits Act which took effect on March 23, 2010, may also apply if the Claimant has more than 15 years of underground coal mine employment (or employment in substantially similar conditions) and a totally disabling pulmonary or respiratory impairment.[7] Amendments to the regulations implementing the 2010 amendments to the Act took effect on October 25, 2013.[8]

## III.    ISSUES

The issues contested by the Employer, or by the Employer and the Director, OWCP, are:

1.    How long the Claimant worked as a miner.

2.    Whether he has pneumoconiosis as defined by the Act and the regulations.

3.    Whether his pneumoconiosis arose out of coal mine employment.

4.    Whether he is totally disabled.

5.    Whether his disability is due to pneumoconiosis.

DX 34. The Employer reserved its right to challenge the statute and regulations, and withdrew the issues of whether the claim was timely, whether the Claimant was a miner, whether he worked as a miner after December 31, 1969, and whether the Employer was properly named as the responsible operator. Employer's Brief at 7. The Employer conceded that the Claimant has one dependent absent evidence that he and his wife are no longer married. Employer's Brief at 3.

## IV.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.    Factual Background

#### 1.    Personal History

The Claimant was born in 1944. DX 3. He has been married to his wife since 1967. DX 3, DX 9. There is no evidence in the record that they are no longer married. The Claimant did not identify any dependents other than his wife on his claim form.

The Claimant worked for the Employer intermittently between 1978 and 1998. He left the Employer in 1998 because he was laid off. DX 17. He then worked at a synthetic fuel plant until 2005, but, for the reasons stated below, I have found that his later employment did not constitute work as a miner. His last job for the Employer was as a mechanic in the shop, where he repaired truck axels, bearings, and brake drums. He had to lift 50 to 75 pounds four or five times a day and carry the items a few feet. DX 5, DX 11. All of his coal mine employment was in Indiana.

---

[7] *See* the Patient Protection and Affordable Care Act, Pub. L. No. 111-148 § 1556, 124 Stat. 119 (2010), codified at 30 U.S.C § 921(c)(4) and 932(l); 20 C.F.R. § 718.305, 78 Fed. Reg. 59114 (Sept. 25, 2013).
[8] 78 Fed. Reg. 59102 *et seq*. (September 25, 2013).

DX 4. Therefore this claim is governed by the law of the Seventh Circuit.[9] The Claimant never filed a claim for state workers' compensation due to pneumoconiosis or other chronic lung disease. DX 3, DX 8.

The Claimant has not testified in this case because no hearing was held, and there is no indication that he was deposed. As a result, the only evidence regarding his smoking history is contained in the medical evidence. His family doctor reported in the progress note from his first visit that he quit smoking in 1998, but the note did not say how long or how much he smoked. The Claimant told another treating doctor that he quit smoking in 1988. There is no evidence in the treatment records that he ever resumed smoking, and testing in 2010 confirmed that he was not smoking. His reports to the doctors who examined him in connection with the claim were more detailed, but not exactly the same. But he told both that he quit smoking in 1988. I conclude that Dr. Fletcher made a clerical error when he wrote 1998 on the Claimant's chart. Based on the reports other than Dr. Fletcher's, I find that the Claimant smoked one-half to one pack per day beginning in 1959 or 1960 (age 15 or 16), with a possible break from 1962 to 1967, and ending in 1988, for a 12 to 22.5 pack-year smoking history.

## 2.    Length of Coal Mine Employment

The 1977 amendments to the Black Lung Benefits Act state that the purpose of the Act is to provide benefits, in cooperation with the states, to miners who are totally disabled due to coal workers' pneumoconiosis, and to surviving dependents of miners whose death was due to such disease.[10] Thus, a prerequisite to establishing entitlement to benefits is proving that the claim is on behalf of a coal miner or a survivor of a coal miner. The current regulations provide the following definition of the term "miner":

> Miner or coal miner means any individual who works or has worked in or around a coal mine or coal preparation facility in the extraction or preparation of coal. The term also includes an individual who works or has worked in coal mine construction or transportation in or around a coal mine, to the extent such individual was exposed to coal mine dust as a result of such employment (see § 725.202). For purposes of this definition, the term does not include coke oven workers.[11]

Moreover, the regulations also provide a rebuttable presumption that certain individuals are miners, as follows:

> (a) Miner defined. A 'miner' for the purposes of this part is any person who works or has worked in or around a coal mine or coal preparation facility in the extraction, preparation, or transportation of coal, and any person who works or has worked in coal mine construction or maintenance in or around a coal mine or coal preparation facility. **There shall be a rebuttable presumption that any person working in or around a coal mine or coal preparation facility is a miner.** This presumption may be rebutted by proof that:

---

[9] *Shupe v. Director, OWCP*, 12 BLR 1-200, 1-202 (1989) (*en banc*).
[10] 30 U.S.C. § 901(a).
[11] 20 C.F.R. § 725.101(a)(19).

S.App. 15

(1) The person was not engaged in the extraction, preparation, or transportation of coal while working at the mine site, or in maintenance or construction of the mine site; or

(2) The individual was not regularly employed in or around a coal mine or coal preparation facility.[12]

In addition, the regulation specifically addresses coal construction and transportation workers. That provision states:

(b) Coal mine construction and transportation workers; special provisions. A coal mine construction or transportation worker shall be considered a miner to the extent such individual is or was exposed to coal mine dust as a result of employment in or around a coal mine or coal preparation facility. A transportation worker shall be considered a miner to the extent that his or her work is integral to the extraction or preparation of coal....

(1) There shall be a rebuttable presumption that such individual was exposed to coal mine dust during all periods of such employment occurring in or around a coal mine or coal preparation facility for purposes of:

(i) Determining whether such individual was or is a miner; ...

(2) The presumption may be rebutted by evidence which demonstrates that:

(i) The individual was not regularly exposed to coal mine dust during his or her work in or around a coal mine or coal preparation facility; or

(ii) The individual did not work regularly in or around a coal mine or coal preparation facility.[13]

The Claimant alleged that he worked in the mines for 32 years. DX 3. The District Director, OWCP, found that he had 13 years of coal mine employment. DX 29. The Employer argued that the Claimant had at most between 13 and 14 years of coal mine employment. Employer's Brief at 8–9. The Employer's records and Social Security earnings show that the Claimant worked for it as a miner between 1978 and 1998, with some periods of layoff during which he was employed elsewhere, for a total of less than 14 years. DX 6, DX 7, DX 17. Thus I find at least 13 years of coal mine employment based on his work for the Employer.

In his "Employment History," DX 4, and "Description of Coal Mine Work and Other Employment," DX 5, the Claimant identified three additional jobs in which he was exposed to

---

[12] 20 C.F.R. § 725.202(a) (emphasis added).
[13] 20 C.F.R. 725.202(b).

S.App. 16

coal dust. Those jobs included hauling coal as a truck driver for Albert Ashley Trucking (1964–1965) and Lemmons and Co., Inc. (1965, 1967–1968), and working around coal at Carbon Operations Indiana, a synthetic fuel plant (1999–2005). (I have relied on the Social Security records rather than the Claimant's Employment History form for the dates of employment at each company.) There is no evidence that the Claimant was employed in or around a coal mine or coal preparation facility, or that his work was integral to the extraction or preparation of coal, when he was hauling coal and working at the synthetic fuel plant. As a result, the presumption that he was a miner does not apply. I cannot tell for certain, but all three of those jobs may have been ancillary to delivery and commercial use of coal, which does not constitute work as a miner.[14] The burden is on the Claimant to establish how long he worked as a miner. He has failed to establish that he was a miner at any jobs other than his job for the Employer.

I find that the Claimant had at least 13 years of coal mine employment based on his employment with the Employer. Effective March 23, 2010, the Patient Protection and Affordable Care Act (PPACA),[15] amended the Black Lung Benefits Act to revive the rebuttable presumption that a miner with a totally disabling respiratory or pulmonary impairment who worked 15 years in underground mines (or in substantially similar conditions) is totally disabled due to pneumoconiosis.[16] Because the Claimant has established fewer than 15 years of coal mine employment, however, the 15 year presumption does not apply in this case.

### B.      Medical Evidence

#### 1.      Chest X-rays

Chest x-rays may reveal opacities in the lungs caused by pneumoconiosis and other diseases. Larger and more numerous opacities result in greater lung impairment. The following table summarizes the x-ray findings available in this case. X-ray interpretations submitted by the parties were in accordance with the limitations on medical evidence contained in the regulations.[17] Treatment records are not subject to the limitations.

The existence of pneumoconiosis may be established by chest x-rays classified as category 1, 2, 3, A, B, or C according to ILO-U/C International Classification of Radiographs. Small opacities (1, 2, or 3) (in ascending order of profusion) may be classified as round (p, q, r) or irregular (s, t, u), and may be evidence of "simple pneumoconiosis." Large opacities (greater than 1 cm) may be classified as A, B or C, in ascending order of size, and may be evidence of "complicated pneumoconiosis." A chest x-ray classified as category "0," including subcategories 0/-, 0/0, 0/1, does not constitute evidence of pneumoconiosis.[18] Any such readings are therefore included in the "negative" column. X-ray interpretations which made no reference to pneumoconiosis, positive or negative, given in connection with medical treatment or review of an x-ray film solely to determine its quality, are listed in the "silent" column.

---

[14] *See Mitchell v. Director, OWCP*, 855 F.2d 485, 489 (7th Cir. 1988*); Director, OWCP v. Ziegler Coal Co. [Wheeler]*, 853 F.2d 529, 533–535 (7th Cir. 1988); *Foster v. Director, OWCP*, 8 B.L.R. 1-188 (1985); *Whisman v. Director, OWCP*, 8 B.L.R. 1-96 (1985).

[15] Pub. L. No. 111-148, § 1556, 124 Stat. 119 (2010), codified at 30 U.S.C § 921(c)(4) and 932(l).

[16] *See* Section 411(c)(4) of the Black Lung Benefits Act, 30 U.S.C. § 921(c)(4) (2011); 20 C.F.R. § 718.305.

[17] *See* 20 C.F.R. § 725.414.

[18] 20 C.F.R. § 718.102(b).

Physicians' qualifications appear after their names. Qualifications of physicians who read x-rays in connection with the black lung claim have been obtained where shown in the record by curriculum vitae or other representations. The National Institute for Occupational Safety and Health (NIOSH)[19] certifies physicians for their knowledge of diagnosing pneumoconiosis by means of chest x-rays. Physicians are designated as "A" readers after completing a course in the interpretation of x-rays for pneumoconiosis. Physicians are designated as "B" readers after they have demonstrated expertise in interpreting x-rays for the existence of pneumoconiosis by passing an examination. Qualifications of physicians are abbreviated as follows: A= NIOSH certified A reader; B= NIOSH certified B reader; BCR= board certified in radiology. I have not attempted to determine the qualifications of readers who read x-rays in connection with the Claimant's treatment. Readers who are board certified radiologists and/or B readers are classified as the most qualified.[20] B readers need not be radiologists. Finally, it is within the Administrative Law Judge's discretion to accord greatest weight to a "dually qualified" physician, i.e., a board certified radiologist who is also a NIOSH certified B reader.[21]

| Date of X-ray | Read as Positive for Pneumoconiosis | Read as Negative for Pneumoconiosis | Silent as to the Presence of Pneumoconiosis |
|---|---|---|---|
| 10/16/03 | | | EX 4 Linge Normal chest. |
| 04/26/10 | CX 1 Alexander B, BCR Classified 1/0 | DX 11 Whitehead B, BCR  EX 3 Meyer B, BCR | DX 11 Gaziano B Read for quality only. Quality 1 (good). |

### 2.    Digital Chest X-rays

Digital x-ray interpretations are not considered "chest x-ray" evidence, as they do not satisfy the quality standards under Appendix A of Part 718.[22] As a result, digital chest x-rays are "properly considered under 20 C.F.R. § 718.107 ["Other medical evidence"], where the Administrative Law Judge must determine, on a case-by-case basis … whether the proponent of the digital x-ray evidence has established that it is medically acceptable and relevant to entitlement."[23] The parties are entitled to introduce only one affirmative reading of "other"

---

[19] http://www.dol.gov/owcp/dcmwc/B-ReaderList.pdf.

[20] See Mullins Coal Co. v. Director, OWCP, 484 U.S. 135, 145 n. 16 (1987); Old Ben Coal Co. v. Battram, 7 F.3d 1273, 1276 n.2 (7th Cir. 1993).

[21] Zeigler Coal Co. v. Kelley, 112 F.3d 839, 842–843 (7th Cir. 1997); Peranich v. Director, OWCP, BRB No. 87-3158 BLA (Nov. 27, 1990) (unpub.).

[22] The Department of Health and Human Services recently modified its regulations for medical examinations of coal miners by adding a set of standards permitting use of digital radiography systems, see 77 Fed. Reg. 56718 et seq. (Sept. 13, 2012), but the Department of Labor has not yet adopted standards for administration and interpretation of digital x-rays.

[23] Webber v. Peabody Coal Co, 23 BLR 1-123, 1-133 (2006) (en banc) (J. Boggs, concurring) (citations omitted). See also Harris v. Old Ben Coal Co., 24 BLR 1-13, 1-16–17 (2007) (en banc on recon.) (J. McGranery and J. Hall, concurring and dissenting), aff'g. 23 BLR 1-98 (2006) (en banc).

evidence such as digital x-rays, and one rebuttal reading to respond to the opposing party's affirmative reading.[24] The limitation does not apply to treatment records.

The x-ray taken on July 6, 2010, as part of Dr. Repsher's examination of the Claimant for the Employer, was a digital x-ray. Dr. Repsher is a pulmonologist who is a B reader. In his report and at his deposition, Dr. Repsher said that digital chest x-rays are generally accepted diagnostic techniques, and that the x-ray was of diagnostic quality and reliable for determining the presence or absence of pneumoconiosis. Dr. Repsher said the x-ray was negative for pneumoconiosis, classifying it 0/0. The Employer also had this x-ray re-read by two dually qualified readers, Dr. Meyer, EX 2, and Dr. Wiot, EX 7, both of whom designated it as negative for pneumoconiosis. Dr. Meyer said that it was a digital film of good quality which was acceptable for evaluation for the presence or absence of pneumoconiosis. Dr. Wiot did not identify it as a digital x-ray, but said the film was of acceptable quality. On its Evidence Summary Form, the Employer designated the latter two readings as initial x-ray evidence, rather than "other" evidence. Despite the error in the designation, it is entitled to two readings, because the Claimant also designated two readings, one as affirmative evidence, and one as rebuttal. But the Employer did not designate Dr. Repsher's reading, which is not admissible because it exceeds the limitations on medical evidence. Thus I will not consider Dr. Repsher's reading. In any event, at his deposition, EX 8, Dr. Repsher said he also saw Dr. Wiot's negative reading of the x-ray, and would defer to it.

Drs. Smith and Alexander read the digital x-ray for the Claimant. Both are dually qualified. Both read the x-ray as positive for pneumoconiosis, category 1/1. CX 1.

### 3. CT Scans

CT scans may be used to diagnose pneumoconiosis and other pulmonary diseases. The regulations provide no guidance for the evaluation of CT scans. They are not subject to the specific requirements for evaluation of x-rays, and must be weighed with other acceptable medical evidence under 20 C.F.R. § 718.107.[25] Moreover, because the regulations do not contain quality standards for CT scans, the party proffering the CT scan "bears the burden to demonstrate that the test or procedure is medically acceptable and relevant to establishing or refuting a claimant's entitlement to benefits."[26] The parties are entitled to introduce only one affirmative reading of "other evidence" such as CT scans, and one rebuttal reading to respond to the opposing party's affirmative reading.[27] The limitation does not apply to treatment records.

In this case, no party proffered a CT scan administered or read in connection with the claim, but one CT scan is included in the treatment records. It was taken at the emergency room after the Claimant was in a car accident in January 2009. The radiologist said the lung fields were clear, and that it was a normal CT scan. The Board has stated that the quality standards are

---

[24] *Webber v. Peabody Coal Co.*, 23 BLR 1-123 (2006) (*en banc*); H.M. v. Clinchfield Coal Col., BRB No. 07-0288BLA, slip op. at 6 (BRB Dec. 31, 2007).
[25] *Melnick v. Consolidation Coal Co.*, 16 BLR 1-31, 1-33–1-34 (1991).
[26] 20 C.F.R. § 718.107(b).
[27] *Webber v. Peabody Coal Co.*, 23 BLR 1-123 (2006) (*en banc*); H.M. v. Clinchfield Coal Col., BRB No. 07-0288BLA, slip op. at 6 (BRB Dec. 31, 2007).

S.App. 19

not applicable to hospitalization and treatment records.[28] But the administrative law judge "still must be persuaded that the evidence is reliable in order for it to form a basis for a finding of fact on an entitlement issue."[29] I infer from the Claimant's treatment records that his treating physicians found the CT scan to be a reliable basis for making decisions regarding appropriate diagnosis and treatment of the Claimant's condition. Moreover, Dr. Renn, one of the Employer's experts, testified at his deposition that CT scans are better than chest x-rays because they provide a three-dimensional view instead of two-dimensional, and the correlation between CT and pathological findings exceeds the correlation between x-ray and pathological findings. EX 2.

### 4.    Pulmonary Function Studies

Pulmonary function studies are tests performed to measure obstruction or restriction in the airways of the lungs and the degree of impairment of pulmonary function. The greater the resistance to the flow of air, the more severe the lung impairment. Tests most often relied upon to establish disability in black lung claims measure forced vital capacity (FVC), forced expiratory volume in one second ($FEV_1$) and maximum voluntary ventilation (MVV).

The following table summarizes the results of the pulmonary function studies available in this case. Pulmonary function studies submitted by the parties were in accordance with the limitations on medical evidence contained in the regulations.[30] "Pre" and "post" refer to administration of bronchodilators. In a "qualifying" pulmonary study, the $FEV_1$ must be equal to or less than the applicable values set forth in the tables in Appendix B of Part 718, and either the FVC or MVV must be equal to or less than the applicable table value, or the $FEV_1$/FVC ratio must be 55% or less.[31]

---

[28] *See J.V.S. v. Arch of West Virginia / Apogee Coal Co.*, 24 BLR 1-78, 1-89 (2010); 20 C.F.R. § 718.101(b).
[29] 65 Fed. Reg. 79928 (2000).
[30] 20 C.F.R. § 725.414.
[31] 20 C.F.R. § 718.204(b)(2)(i).

- 9 -

| Ex. No. Date Physician | Age Height | FEV$_1$ Pre- / Post | FVC Pre- / Post | FEV$_1$ / FVC Pre- / Post | MVV Pre- / Post | Qualify? | Physician Impression |
|---|---|---|---|---|---|---|---|
| DX 11 04/26/10 Houser | 65 70" | 1.16 1.63 | 2.01 2.86 | 58% 57% | | Yes No | Baseline testing invalid. Post bronchodilator showed moderate obstruction with moderate bronchodilator response due in part to improved effort. Valid per Dr. Renn, EX 1. |
| DX 26 07/06/10 Repsher | 65 70" | 1.43 1.48 | 2.37 2.63 | 60% 56% | | Yes No | Invalid per Dr. Repsher, and Dr. Renn, EX 1. |

## 5.    Arterial Blood Gas Studies

Blood gas studies are performed to measure the ability of the lungs to oxygenate blood. A defect will manifest itself primarily as a fall in arterial oxygen tension either at rest or during exercise. The blood sample is analyzed for the partial pressure of oxygen (PO$_2$) and the partial pressure of carbon dioxide (PCO$_2$) in the blood. A lower level of oxygen (O$_2$) compared to carbon dioxide (CO$_2$) indicates a deficiency in the transfer of gases through the alveoli which may leave the miner disabled.

The following table summarizes the arterial blood gas studies available in this case. Arterial blood gas studies submitted by the parties were in accordance with the limitations on medical evidence contained in the regulations. A "qualifying" arterial gas study yields values which are equal to or less than the applicable values set forth in the tables in Appendix C of Part 718. If the results of a blood gas test at rest do not satisfy Appendix C, then an exercise blood gas test can be offered. No exercise studies were performed in this case. Exercise studies are not required if medically contraindicated.

| Exhibit Number | Date | Physician | PCO$_2$ | PO$_2$ | Qualify? | Physician Impression |
|---|---|---|---|---|---|---|
| DX 11 | 04/26/10 | Houser | 50.5 | 67.8 | Yes | |
| DX 26 | 07/06/10 | Repsher | 51 | 71 | Yes | PO$_2$ normal per Dr. Renn, EX 1. |

- 10 -

6.    **Medical Opinions**

Medical opinions are relevant to the issues of whether the Claimant has pneumoconiosis, whether he is totally disabled, and whether pneumoconiosis caused his disability.

Because the Claimant had less than 15 years of coal mine work, he bears the burden of establishing all elements of entitlement to benefits. A determination of the existence of pneumoconiosis may be made if a physician, exercising sound medical judgment, notwithstanding a negative x-ray, finds that the miner suffers from pneumoconiosis as defined in the regulations.[32] Thus, even if the x-ray evidence is negative, medical opinions may establish the existence of pneumoconiosis.[33] The medical opinions must be reasoned and supported by objective medical evidence such as blood gas studies, electrocardiograms, pulmonary function studies, physical performance tests, physical examination, and medical and work histories.[34] Where total disability cannot be established by pulmonary function tests, arterial blood gas studies, or cor pulmonale with right-sided heart failure, or where pulmonary function tests and/or blood gas studies are medically contraindicated, total disability may be nevertheless found, if a physician, exercising reasoned medical judgment, based on medically acceptable clinical and laboratory diagnostic techniques, concludes that a miner's respiratory or pulmonary condition prevents or prevented the miner from engaging in employment, i.e., performing his usual coal mine work or comparable and gainful work.[35] With certain specified exceptions not applicable here, the cause or causes of total disability must be established by means of a physician's documented and reasoned report.[36]

The record contains the following treatment records and medical opinions.

a)    **Treatment Records**

The Employer submitted records from the Claimant's family doctor, Dr. Gregory Fletcher, for 2002 to 2010, and Ohio Valley Heartcare from 2003 to 2009. EX 4, EX 6. In the following discussion, I have focused on records pertaining to the Miner's cardiopulmonary systems.

The Claimant began seeing Dr. Fletcher in May 2002, because he needed a family doctor. According to West's National Physician Directory,[37] Dr. Fletcher is board certified in Family Practice. The Claimant complained of not feeling well and being tired all the time. Dr. Fletcher indicated that the Claimant quit smoking in 1998. In the review of symptoms, he marked that the Claimant was short of breath with exertion. His handwritten notes on the physical examination are difficult to decipher, but the chest examination revealed expiratory wheezes. Dr. Fletcher's assessment included obstructive sleep apnea, hypertension without congestive heart failure,

---

[32] 20 C.F.R. § 718.202(a)(4); for the definition, *see* 20 C.F.R. § 718.201.
[33] *Taylor v. Director, OWCP*, 9 BLR 1-22 (1986).
[34] 20 C.F.R. § 718.202(a)(4).
[35] 20 C.F.R. § 718.204(b)(2)(iv).
[36] 20 C.F.R. § 718.204(c)(2).
[37] Available at http://www.westlaw.com.

- 11 -

obesity, and osteoarthritis. Dr. Fletcher saw the Claimant a second time in May, and a third time in July, because he had cellulitis in his leg. EX 4.

The Claimant returned to Dr. Fletcher for routine follow-up in December 2002. He was feeling pretty well.  Chest examination revealed normal breath sounds. Dr. Fletcher assessed well controlled hypertension, obesity, and hyperlipidemia. EX 4.

The Claimant next saw Dr. Fletcher on June 2, 2003. The Claimant denied any shortness of breath. His hypertension was not controlled, so Dr. Fletcher added medication. EX 4.

The Claimant saw Dr. Fletcher on October 13, 2003, for a recheck and preoperative surgical clearance. The Claimant had no chest pain, shortness of breath, orthopnea or paroxysmal nocturnal dyspnea. Chest examination revealed distant breath sounds due to obesity. Electrocardiogram and chest x-ray were normal. EX 4.

The Claimant underwent replacement of his right knee on November 4, 2003. Two days later, he had a right temporal lobe cerebrovascular accident (CVA). Electrocardiogram was borderline. Echocardiogram showed a normal ejection fraction. He was admitted to St. Mary's rehabilitation Institute from November 11 to December 3, 2003. He made good improvement and met all of his inpatient rehabilitation goals. He had bronchospasm on admission which resolved with Combivent. Rehabilitation discharge diagnoses were status post acute right temporal lobe infarct with left hemiparesis, status post elective right total knee replacement, anemia secondary to the knee surgery, hypertension, morbid obesity, carotid artery disease with 40-59% stenosis, ex-smoker, mild chronic obstructive pulmonary disease (COPD), and degenerative arthritis status post two arthroscopic surgeries of the right knee. He was discharged home in stable condition. EX 6.

The Claimant followed up with Dr. John Hamelink on December 15, 2003. EX 6. According to West's National Physician Directory, Dr. Hamelink is board certified in General Surgery, with vascular surgery as his primary specialty. Dr. Hamelink identified the Claimant's chief complaint as recent right temporal cerebrovascular accident with associated moderate carotid stenoses, shown in an MRI and carotid duplex. He noted that echocardiogram had shown normal left ventricular function and ejection fraction. The Claimant was still in rehabilitation for his right knee replacement, and had recovered function of the left extremities for the most part, without speech or swallowing difficulties. Dr. Hamelink said the Claimant had been a smoker who quit 15 years before (1988). He was not diabetic and had no history of myocardial infarction. He was using a wheelchair. Dr. Hamelink's impression was recent right brain stroke with unknown etiology associated with moderate carotid stenoses. He planned to continue to monitor the Claimant's carotid disease with follow-up duplex.

Dr. Fletcher also saw the Claimant for a post hospital visit on December 16, 2003. Dr. Fletcher said the Claimant had almost completely recovered strength in his left arm, but not in his left leg. He did not have trouble speaking or swallowing, or with his memory. His chest was clear. EX 4.

Follow-up with Dr. Hamelink on February 13 and March 15, 2004, included a report of a new duplex which showed mild, diffuse disease in the carotids without severe or significant stenosis. Dr. Hamelink said the Claimant had recovered from speech difficulties and fine motor movement in his upper extremity, but had persistent left lower extremity weakness which preceded the stroke. Dr. Hamelink's impression was significant recovery following a minor right temporal brain stroke, with no significant carotid stenoses. Dr. Hamelink recommended that the Claimant continue his medication and return in one year. EX 4, EX 6.

The Claimant returned to see Dr. Fletcher in April 2004 after an incident of light headedness, blurry vision and weakness during rehabilitation. He had no shortness of breath or chest pain. He had lost 60 pounds since his stroke. He had some left-sided hemiparesis and was using a walker. Dr. Fletcher assessed orthostatic hypotension with a history of hypertension without congestive heart failure, and status post CVA with left hemiparesis.

At a six month recheck with Dr. Fletcher in October 2004, the Claimant said he had returned to work and was getting around OK. His chest was clear. Dr. Fletcher assessed stable status post CVA with left hemiparesis, and history of anemia which was being treated with iron. EX 4.

The Claimant next saw Dr. Fletcher in April 2005. He was using a cane for his left sided hemiparesis. He complained of fatigue. The Claimant returned for a complete physical examination in May 2005. He denied chest pain and shortness of breath. He had retired, and was spending time working at home in his shop. His past medical history was significant for knee osteoarthritis, obstructive sleep apnea, hypertension without congestive heart failure, obesity, mixed hyperlipidemia, and status post CVA with left hemiparesis. His lungs were clear. There were no new cardiopulmonary diagnoses. The Claimant continued to see Dr. Fletcher about every six months thereafter with no significant cardiopulmonary problems or changes in his diagnoses. Dr. Fletcher ordered an MRI of the Claimant's brain in May 2008. It showed no acute infarct, mild to moderate small vessel ischemic changes, and chronic sinusitis. EX 4.

The Claimant was in a car accident in January 2009, resulting in a broken wrist which required surgery. A CT scan of his chest taken while he was in the emergency room was normal. After the surgery, he had a pulmonary embolism. EX 4.

Dr. Fletcher performed a physical examination on July 7, 2009. The Claimant was feeling fine. He did not report any chest pain or shortness of breath. There were no new cardiopulmonary diagnoses.

The Claimant returned to Ohio Valley Heartcare on October 8, 2009, for evaluation of his carotid and vertebral circulation prior to surgery on his right arm due to the auto accident. He was seen by Dr. Larry Bucshon, who is board certified in General Surgery. Dr. Bucshon reported that the Claimant had a history of stroke in November 2003, hypertension, past smoking, hyperglycemia, hypertension, and morbid obesity. Sonography revealed mild to moderate diffuse carotid disease with no significant obstruction, and patent vertebrals. EX 6.

- 13 -

The Claimant's last reported visit to Dr. Fletcher took place on June 2, 2010. The Claimant complained of a dry cough, rhinorrhea, headache, and difficulty sleeping for the past week. Chest examination revealed a few rhonchi. Dr. Fletcher assessed status post CVA with left hemiparesis, and acute sinusitis. There is no evidence anywhere in Dr. Fletcher's records that the Claimant was prescribed medication for his breathing on any regular basis. He never diagnosed congestive heart failure. EX 4.

**b)**     **Opinions Given in Connection with the Black Lung Claim**

Dr. William Houser examined the Claimant on behalf of the Department of Labor on April 26, 2010. DX 11. According to his curriculum vitae, Dr. Houser is board certified in Internal Medicine and Pulmonary Disease. DX 12. He is an A reader.[38] He took occupational, social, family and medical histories, and conducted a physical examination, electrocardiogram, chest x-ray, blood gas studies and pulmonary function testing. He reported that the Claimant worked in the mines for 26 years. That total included non-mining work which involved coal dust exposure with a description of the Claimant's job at a synthetic fuel plant which followed his work for the Employer. Dr. Houser reported a smoking history of ½ to 1 pack per day from 1959 to 1988, amounting to 22.5 pack-years. The Claimant reported symptoms of shortness of breath, occasional productive cough, wheezing, and ankle edema. He reported having had a stroke with left-sided weakness and initial speech difficulty. He was using a walker due to orthopedic problems. Dr. Houser said his speech was normal, but he might have some minimal left sided weakness. The chest examination revealed diminished breath sounds. The electrocardiogram was normal. Dr. Houser relied on Dr. Whitehead's reading of the x-ray as showing hyperinflation, but negative for pneumoconiosis. The pre-bronchodilator pulmonary function test was invalid due to poor effort. Post bronchodilator study showed moderately severe obstruction with moderate bronchodilator response partly due to improved effort. The resting arterial blood gas study revealed mild hypoxemia and mild hypercapnia (also known as hypercarbia). No exercise study was performed because the Claimant was walking with a walker. Dr. Houser diagnosed moderately severe COPD due to smoking and exposure to coal and rock dust arising from coal mine employment. He said that the Claimant's COPD was the sole cause of his respiratory impairment, and that he was unable to perform his former coal mining job from a respiratory standpoint.

Dr. Lawrence Repsher examined the Claimant on behalf of the Employer on July 6, 2010. DX 26. According to his curriculum vitae, Dr. Repsher is board certified in Internal Medicine and Pulmonary Disease, and a B reader. He took occupational, social, family and medical histories, and conducted a physical examination, electrocardiogram, chest x-ray, blood gas studies and pulmonary function testing. He reported that the Claimant worked in the mines for 26 years, and, in addition, 6 additional years reclaiming previously mined coal for synthetic fuel. He reported a smoking history of up to one-half pack per day for from age 16-17 (1960–1961), none from age 18 to 23 (1962–1967), and then resuming until 1988, for a total of 12 pack-years. The Claimant reported symptoms of progressive shortness of breath for the past 20 years and a non-productive cough, along with ankle edema requiring diuretics for the past 3 to 4 years, hypertension, and symptoms of gastroesophageal reflux disease (GERD) and transient ischemic attacks. He had a cerebral vascular accident (CVA) with transient left hemiparesis and speech

---

[38] http://www.dol.gov/owcp/dcmwc/B-ReaderList.pdf.

- 14 -

difficulty. The chest examination revealed diminished breath sounds. The electrocardiogram showed low voltage consistent with morbid obesity. A blood count showed mild anemia. Dr. Repsher read the digital x-ray as negative for pneumoconiosis. He said that digital x-rays are generally accepted diagnostic techniques for the presence or absence of pneumoconiosis, and the tests in this case were of diagnostic quality and reliable for determining whether or not radiographic pneumoconiosis was present. The pulmonary function testing (PFT) was invalid due to poor effort and cooperation. Arterial blood gases (ABG) were consistent with Pickwickian Syndrome. The test results appear on the table above. Carboxyhemoglobin was normal and nicotine and cotinine were not detected, consistent with a non-smoker. Dr. Repsher said that Dr. Houser ignored the Claimant's well documented morbid obesity and Pickwickian Syndrome, which is characterized by chronic respiratory failure with decreased $pO_2$ and increased $pCO_2$. Dr. Repsher's opinion was that there no evidence of medical or legal pneumoconiosis or other pulmonary or respiratory condition caused by exposure to coal mine dust; COPD "overwhelmingly most likely due to" smoking; morbid obesity; Pickwickian Syndrome; GERD; probable obstructive sleep apnea; and right ventricular congestive heart failure due to COPD, morbid obesity, and sleep apnea. He based his opinion that the Claimant does not have pneumoconiosis on the absence of radiographic or histologic evidence; invalid pulmonary function testing with flow volume loops suggestive of clinically significant COPD, but "no PFT evidence of CWP"; and ABG's documenting Pickwickian Syndrome but not pneumoconiosis. Dr. Repsher said coal mine dust can contribute to development of COPD in some people, but cigarette smoking is the most common and powerful cause of COPD and centrilobular emphysema. He said 13% of smokers develop potentially catastrophic COPD, but only some miners would have a clinically significant loss of $FEV_1$ due to coal mine dust exposure. He said surface miners are less likely to develop pneumoconiosis than underground miners, and miners who worked after 1970 are less likely to develop it than those who worked before, due to reduced dust exposure. He said even if the Claimant's pulmonary function test were valid, his COPD would be due to smoking, with only a de minimis contribution from coal dust. He said the Claimant had not been exposed to coal dust since 2005, and his pulmonary function testing showed characteristic changes due to smoking, but not those due to coal mine dust exposure, based on a disproportionate decrease in $FEV_1$ and FVC. He said even if coal dust contributed to presumed COPD, it would not have been clinically significant compared to the effects of smoking. He cited to scientific literature to support his reasoning. He said the Claimant is suffering from serious diseases and conditions, but none could fairly be attributed to his coal mine work.

Dr. Joseph Renn reviewed the Claimant's medical records on behalf of the Employer and provided a report dated February 12, 2011. EX 1. Dr. Renn is board certified in Internal Medicine and Pulmonary Disease, and a B reader. Records he reviewed included the Claimant's treatment and work history records, the reports by Drs. Houser and Repsher, and x-ray readings from the treatment records and the Employer. He credited the Claimant with 26 years of coal mine employment. He noted that the Claimant's reported smoking history varied from 12 to 22 pack-years ending in 1988 or 1998. He described the contents of the evidence he reviewed, including the testing. He said pulmonary function testing by Dr. Houser was valid, and by Dr. Repsher, invalid. He said diffusing capacity was normal when adjusted for low hemoglobin and alveolar volume. He said the arterial blood gas study by Dr. Houser revealed hypoxemia and hypercapnia; testing by Dr. Repsher showed hypercapnia, but normoxemia for his age. Dr. Renn

- 15 -

said the Claimant has COPD with an asthmatic component, but neither legal nor medical pneumoconiosis. He said the COPD was due to smoking with a bronchospastic component. He also diagnosed history of obstructive sleep apnea, history of pulmonary embolus, systemic hypertension, sequelae of CVA-left hemiparesis, hyperlipidemia, severe obesity approaching morbid obesity, and gastroesophageal reflux disease (GERD). He based his opinion that the Claimant does not have pneumoconiosis on the absence of radiographic changes, the presence of bronchoreversible obstructive defect, the absence of disproportionate reduction of volumes and flows during FVC, normal diffusion capacity, and transient hypoxemia. He said hypercapnia is consistent with obstructive sleep apnea and obstructive disease due to smoking, but not obstructive disease associated with pneumoconiosis. He said the Claimant's obesity is a risk factor for obstructive sleep apnea which can result in systemic hypertension, pulmonary hypertension, cerebrovascular disease, ischemic stroke, heart failure, cardiac arrhythmias, and hypoventilation tending to hypercapnia.

Dr. Renn was deposed by the Employer on August 11, 2011. No one participated on behalf of the Claimant. In preparing for his deposition, Dr. Renn reviewed the positive x-ray readings submitted by the Claimant which were not available to him when he wrote his report. He said when he is called upon to review medical records, he considers both medical and legal pneumoconiosis, and that both can be latent, progressive, and disabling. He said that significantly broncho-reversible obstruction, disproportionate reduction of the $FEV_1/FVC$ ratio, improvement in oxygen tension over time, and carbon dioxide retention do not occur with medical pneumoconiosis. Medical pneumoconiosis does cause reduced diffusing capacity, but the Claimant's was normal. He said the Claimant's $pO_2$ increased 20 ml (from 50.5 to 71) between April and July 2010. Dr. Houser's actual test report reveals that Dr. Renn was mistaken in this observation because he reversed the $pO_2$ and $pCO_2$ values obtained by Dr. Houser. The $pO_2$ increased, but only by 3.2 ml. Dr. Renn criticized Dr. Alexander's B readings because opacities were classified smaller in the later (digital) x-ray, which would not occur with pneumoconiosis. Dr. Renn said that the Claimant's COPD with bronchospasm was due to smoking, and not coal dust exposure. He said that he could rule out coal dust because it does not cause bronchospasm. He said the Claimant would have been particularly susceptible to lung damage because he started smoking at age 15 before his lungs were fully developed. He said the Claimant had a sufficient smoking history to cause the apparent damage. He said the disproportionate reduction in $FEV_1$ and FVC also indicated that coal dust exposure did not cause the Claimant's COPD. He said the Claimant's hypercapnia is not known to happen in either medical or legal simple pneumoconiosis. He said the Claimant's sleep apnea, formerly known as Pickwickian syndrome, would be a reason for hypercapnia. The Claimant also had other symptoms of sleep apnea such as his stroke. He agreed that no factor alone would rule out coal dust exposure as a cause of the Claimant's problems, but the combination of the Claimant's conditions made him more confident of his diagnosis. He said there was no relationship between smoking and sleep apnea, which were separate disease processes. He said the Claimant's obstructive disease would prevent him from going back to his jobs as a tractor operator or a mechanic. He said the Claimant's disability was not caused or aggravated by coal dust exposure. He cited to medical literature to support his opinion.

Dr. Repsher was deposed by the Employer on April 11, 2012. EX 8. No one participated on behalf of the Claimant. He said that when he examined the Claimant, he became very short of

- 16 -

S.App. 27

breath with minimal exertion. He said the Claimant was morbidly obese, and had severe lower extremity edema. Breath sounds were diminished due to excess tissue on his chest wall. He said the Claimant's hypercapnia, with a $pCO_2$ of 51, indicated chronic respiratory failure. He said the Claimant had right-sided congestive heart failure due to fluid in his lungs. He was also in left ventricular failure. He said the Claimant's shortness of breath was due to obesity and heart disease. He defined Pickwickian syndrome as difficulty breathing due to obesity. Hypercapnia can act as an anesthetic, stopping breathing, and causing death. He thought that the poor effort demonstrated on his pulmonary function testing was due in part to the Claimant's inability to give full effort because of his weight. Despite the invalidity of the pulmonary function testing, the testing did show that the Claimant has COPD for which his smoking put him at high risk. He could not state for sure that coal dust did not cause clinically significant obstruction in the claimant, but his obesity and resultant problems with his respiratory center were overwhelming his ability to keep his blood gases normal. He cited to medical literature to support his view that coal dust does not cause significant decline in lung function compared to smoking or aging, and would not have caused clinical symptoms in the Claimant, especially in view of his Pickwickian syndrome, chronic respiratory failure, and congestive heart failure. He said if the Claimant had 13 rather than 26 years of coal mine employment, that would further reduce the effect of coal dust on his lungs. He said the Claimant has a totally disabling pulmonary impairment due to his morbid obesity and Pickwickian syndrome. He said the Claimant's obstructive disease was not a significant contributor to his disability, and coal dust was probably not a significant contributing factor to his COPD, assuming he worked above ground for only 13 years. If he worked 26 years, it would be more likely to be a contributing factor to his COPD. He disagreed with Dr. Houser's opinion because Dr. Houser did not acknowledge the contribution of obesity and Pickwickian syndrome. He could not rule out legal pneumoconiosis, but he had no evidence to diagnose it. He said the Claimant's obstructive disease was due to obesity and bi-ventricular congestive heart failure.

### C.    Existence of Pneumoconiosis

The regulations define pneumoconiosis broadly:

(a) For the purpose of the Act, "pneumoconiosis" means a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment. This definition includes both medical, or "clinical", pneumoconiosis and statutory, or "legal", pneumoconiosis.

(1) Clinical Pneumoconiosis. "Clinical pneumoconiosis" consists of those diseases recognized by the medical community as pneumoconioses, i.e., the conditions characterized by permanent deposition of substantial amounts of particulate matter in the lungs and the fibrotic reaction of the lung tissue to that deposition caused by dust exposure in coal mine employment. This definition includes, but is not limited to, coal workers' pneumoconiosis, anthracosilicosis, anthracosis, anthrosilicosis, massive pulmonary fibrosis, silicosis or silico-tuberculosis, arising out of coal mine employment.

- 17 -

S.App. 28

    (2) Legal Pneumoconiosis. "Legal pneumoconiosis" includes any chronic lung disease or impairment and its sequelae arising out of coal mine employment. This definition includes, but is not limited to any chronic restrictive or obstructive pulmonary disease arising out of coal mine employment.

    (b) For purposes of this section, a disease "arising out of coal mine employment" includes any chronic pulmonary disease or respiratory or pulmonary impairment significantly related to, or substantially aggravated by, dust exposure in coal mine employment.

    (c) For purposes of this definition, "pneumoconiosis" is recognized as a latent and progressive disease which may first become detectable only after the cessation of coal mine dust exposure.[39]

In this case, the Claimant's medical records indicate that he has been diagnosed with chronic obstructive pulmonary disease, which can be encompassed within the definition of legal pneumoconiosis.[40] But only chronic obstructive pulmonary disease caused by coal mine dust constitutes legal pneumoconiosis.[41]

    A finding of the existence of pneumoconiosis may be based on (1) chest x-ray; (2) biopsy or autopsy; (3) application of a presumption, including the irrebuttable presumption of total disability due to pneumoconiosis if there is a showing of complicated pneumoconiosis,[42] presumptions of pneumoconiosis applicable to claims of miners with 15 or more years of underground coal mine employment (or employment in substantially similar conditions) and a totally disabling pulmonary or respiratory impairment,[43] or presumptions of entitlement applicable only to deceased miners who died on or before March 1, 1978[44]; or (4) a physician exercising sound medical judgment based on objective medical evidence and supported by a reasoned medical opinion.[45] There is no evidence that the Claimant had a lung biopsy, and, of course, no autopsy has been performed. None of the presumptions apply, because the evidence does not establish the existence of complicated pneumoconiosis; the Claimant had less than 15 years of coal mine employment; and he is still living. In order to determine whether the evidence establishes the existence of pneumoconiosis, therefore, I must consider the chest x-rays and medical opinions, along with any other available medical evidence. Absent contrary evidence, evidence relevant to any category may establish the existence of pneumoconiosis. In the face of

---

[39] 20 C.F.R. § 718.201.

[40] *Id.*; *Richardson v. Director, OWCP*, 94 F.3d 164 (4th Cir. 1996); *Warth v. Southern Ohio Coal Co.*, 60 F.3d 173 (4th Cir. 1995).

[41] *Eastover Mining Co. v. Williams*, 338 F.3d 501, 515 (6th Cir. 2003); 65 Fed. Reg. 79938 (2000) ("The Department reiterates ... that the revised definition does not alter the former regulations' ... requirement that each miner bear the burden of proving that his obstructive lung disease did in fact arise out of his coal mine employment, and not from another source.").

[42] 20 C.F.R. § 718.304.

[43] *See* the Patient Protection and Affordable Care Act, Pub. L. No. 111-148 § 1556, 124 Stat. 119 (2010), codified at 30 U.S.C § 921(c)(4) and 932(l).

[44] *See* the former section 20 C.F.R. § 718.306 (2013), removed by 78 Fed. Reg. 59115 (Sept. 25, 2013).

[45] 20 C.F.R. § 718.202(a).

conflicting evidence, however, I must weigh all of the evidence together in reaching my finding whether the Claimant has established that he has pneumoconiosis.[46]

Pneumoconiosis is a progressive and irreversible disease.[47] As a general rule, therefore, more weight is given to the most recent evidence.[48] This rule is not to be mechanically applied to require that later evidence be accepted over earlier evidence.[49]

The available x-rays in this case have been read as both positive and negative for pneumoconiosis. For cases with conflicting x-ray evidence, the regulations specifically provide that the judge must consider the qualifications of the doctors interpreting the x-rays.[50] Readers who are board certified radiologists and/or B readers are classified as the most qualified. The qualifications of a certified radiologist are at least comparable to if not superior to a physician certified as a B reader.[51] Greater weight may be accorded to x-ray interpretations of dually qualified physicians.[52] A judge may consider the number of interpretations on each side of the issue, but not to the exclusion of a qualitative evaluation of the x-rays and their readers.[53]

The record contains one x-ray taken during medical treatment which does not make any reference to pneumoconiosis. Whether a silent x-ray interpretation should be interpreted as negative for pneumoconiosis is an issue of fact for the Administrative Law Judge to resolve.[54] In this case the radiologist interpreted the x-ray to be normal. I find it to be negative for pneumoconiosis.

The x-ray taken on April 26, 2010, was read as positive for pneumoconiosis category by Dr. Alexander, who is dually qualified, and negative by Drs. Whitehead and Meyer, who are also dually qualified. Because two dually qualified doctors found it to be negative, I find this x-ray to be negative as well.

There are no other analog x-rays in the record. A digital x-ray taken on April 26, 2010, was read as positive by two dually qualified readers, and negative by two dually qualified readers. I find the digital x-ray to be inconclusive.

---

[46] *U.S. Mining Co. v. Director, OWCP*, 386 F.3d 977 (11th Cir. 2004); *Island Creek Coal Co. v. Compton*, 211 F.3d 203, 211 (4th Cir. 2000);/ *Penn Allegheny Coal Co. v. Williams*, 114 F.3d 22 (3rd Cir. 1997) / *Dixie Fuel Co., LLC v. Director, OWCP [Hensley]*, 700 F.3d 878 (6th Cir. 2012).

[47] *Labelle Processing Co. v. Swarrow*, 72 F.3d 308, 314–315 (3rd Cir. 1995); *Lane Hollow Coal Co. v. Director, OWCP*, 137 F.3d 799, 803 (4th Cir. 1998); *Woodward v. Director, OWCP*, 991 F.2d 314, 320 (6th Cir. 1993); *Ziegler Coal Co. v. Director, OWCP [Griskell]*, 490 F.3d 609, 618–619 (7th Cir. 2007).

[48] *See Mullins Coal Co. of Virginia v. Director, OWCP*, 484 U.S. 135, 151–152 (1987); *Eastern Associated Coal Corp. v. Director, OWCP*, 220 F.3d 250, 258–259 (4th Cir. 2000); *Crace v. Kentland-Elkhorn Coal Corp.*, 109 F.3d 1163, 1167 (6th Cir. 1997); *Rochester & Pittsburgh Coal Co. v. Krecota*, 868 F.2d 600, 602 (3rd Cir. 1989); *Stanford v. Director, OWCP*, 7 BLR 1-541, 1-543 (1984); *Tokarcik v. Consolidated Coal Co.*, 6 BLR 1-666, 1-668 (1983); *Call v. Director, OWCP*, 2 BLR 1-146, 1-148–1-149 (1979).

[49] *Woodward*, 991 F.2d at 319–320; *Adkins v. Director, OWCP*, 958 F.2d 49 (4th Cir. 1992); *Burns v. Director, OWCP*, 7 BLR 1-597, 1-600 (1984).

[50] 20 C.F.R. § 718.202(a)(1); *Dixon v. North Camp Coal Co.*, 8 BLR 1-344 (1985); *Melnick v. Consolidation Coal Co.*, 16 BLR 1-31, 1-37 (1991).

[51] *Roberts v. Bethlehem Mines Corp.*, 8 BLR 1-211, 1-213 n.5 (1985).

[52] *Sheckler v. Clinchfield Coal Co.*, 7 BLR 1-128, 1-131 (1984).

[53] *Woodward*, 991 F.2d at 321; *see Adkins*, 958 F.2d at 52.

[54] *Marra v. Consolidation Coal Co.*, 7 BLR 1-216 (1984); *Sacolick v. Rushton Mining Co.*, 6 BLR 1-930 (1984).

Finally, a CT scan was normal. Thus it was negative for pneumoconiosis as well.

I find that the Claimant has failed to establish that he has pneumoconiosis based on any of the radiological evidence.

I must next consider the medical opinions. The Claimant can establish that he suffers from pneumoconiosis by well-reasoned, well-documented medical reports. A "documented" opinion is one that sets forth the clinical findings, observations, facts, and other data upon which the physician based the diagnosis.[55] An opinion may be adequately documented if it is based on items such as a physical examination, symptoms, and the patient's work and social histories.[56] A "reasoned" opinion is one in which the judge finds the underlying documentation and data adequate to support the physician's conclusions.[57] Whether a medical report is sufficiently documented and reasoned is for the judge to decide as the finder-of-fact; an unreasoned or undocumented opinion may be given little or no weight.[58] The qualifications of the physicians are relevant in assessing the respective probative values to which their opinions are entitled.[59]

The Department of Labor has taken the position that coal dust exposure may induce obstructive lung disease even in the absence of fibrosis or complicated pneumoconiosis. This underlying premise was stated explicitly in the commentary that accompanied the final version of the current regulations:

> ... Whether coal mine dust exposure can cause chronic obstructive pulmonary disease is a question of medical and scientific fact that will not vary from case to case; thus, it is an appropriate question for the Department to answer by regulation. ... The revised definition will eliminate the need for litigation of this issue on a claim-by-claim basis, and render invalid as inconsistent with the regulations medical opinions which categorically exclude obstructive lung disorders from occupationally-related pathologies. The Department reiterates, however, that the revised definition does not alter the former regulations' ... requirement that each miner bear the burden of proving that his obstructive lung disease did in fact arise out of his coal mine employment, and not from another source. ...[60]

The Department concluded that "[e]ven in the absence of smoking, coal mine dust exposure is clearly associated with clinically significant airways obstruction and chronic bronchitis. **The risk is additive with cigarette smoking.**"[61] Citing to studies and medical literature reviews conducted by NIOSH, the Department quoted the following from NIOSH:

---

[55] *Fields v. Island Creek Coal Co.*, 10 BLR 1-19, 1-22 (1987).
[56] *Hoffman v. B&G Construction Co.*, 8 BLR 1-65, 1-66 (1985); *Hess v. Clinchfield Coal Co.*, 7 BLR 1-295, 1-296 (1984); *Justus v. Director, OWCP*, 6 BLR 1-1127, 1-1129 (1984).
[57] *Fields, supra.*
[58] *Clark v. Karst-Robbins Coal Co.*, 12 BLR 1-149, 1-155 (1989) (*en banc*).
[59] *Burns v. Director, OWCP*, 7 BLR 1-597, 1-599 (1984).
[60] 65 Fed. Reg. 79938 (2000) (citations omitted).
[61] 65 Fed. Reg. 79940 (2000) (emphasis added).

- 20 -

… COPD may be detected from decrements in certain measures of lung function, especially FEV1 and the ratio of FEV1/FVC. **Decrements in lung function associated with exposure to coal mine dust are severe enough to be disabling in some miners, whether or not pneumoconiosis is also present….**[62]

Moreover, the Department concluded that the medical literature "support[s] the theory that dust-induced emphysema and smoke-induced emphysema occur through similar mechanisms."[63] Medical opinions which are based on the premise that coal dust-related obstructive disease is completely distinct from smoking-related disease, or that it is never clinically significant, are therefore contrary to the premises underlying the regulations. On the other hand, while the Department concluded that medical studies have found a significant decrement in coal miners' pulmonary function in addition to that caused by smoking, the regulations require that the issue of whether a miner's disability is due to coal mine employment or smoking must be resolved on a claim-by-claim basis.[64] The burden of proof remains on the miner to show that his obstructive lung disease arose out of his coal mine employment.[65] I have considered how to weigh the conflicting medical opinions in this case based on these principles.

In this case, the Claimant's treating physicians diagnosed COPD, but they did not express an opinion on its cause. Three physicians have given opinions whether the Claimant has pneumoconiosis in connection with the claim. Dr. Houser believed that he does, while Drs. Repsher and Renn did not. I will first address the medical opinion supporting the diagnosis, and then the opinions to the contrary.

Dr. Houser, a board certified pulmonologist and A reader, examined the Claimant on behalf of the Department of Labor. I find he is well qualified to provide an opinion. He took relevant histories, conducted a physical examination, and performed objective tests. He reported 26 years of coal mine employment and 22.5 pack-years of smoking. I have found that about half of the 26 years did not constitute coal mine employment. But all three of the doctors who gave opinions did so based on 26 years, and I have found that the Claimant was exposed to coal dust in jobs other than coal mining. As a result, I have not discredited any of their opinions based on the discrepancy. Dr. Houser found the x-ray taken as part of his examination to be negative for pneumoconiosis. He diagnosed moderately severe obstructive disease. He also said that coal dust and cigarette smoking contributed to the Miner's obstructive disease. I construe Dr. Houser's opinion to be a diagnosis of legal pneumoconiosis. Dr. Houser's attribution of the Claimant's obstructive disease to a combination of factors is consistent with the regulations, and sufficient to meet the requirement that coal dust be a contributing cause to the Claimant's impairment to make a diagnosis of legal pneumoconiosis. I find that his opinion was documented and reasoned. I give it probative weight on the issue of whether the Claimant has legal pneumoconiosis.

Dr. Repsher, who is a board certified pulmonologist and B reader, examined the Claimant on behalf of the Employer. I find he is well qualified to provide an opinion. He took relevant histories, conducted a physical examination, and performed objective tests. He reported 26 years

---

[62] 65 Fed. Reg. 79943 (2000) (emphasis added).
[63] Id.
[64] 65 Fed. Reg. 79941 (2000).
[65] 20 C.F.R. § 725.103; 65 Fed. Reg. 79938 (2000).

of coal mine employment and 12 pack-years of smoking. Thus, in addition to twice the amount of coal mine employment, he relied on half the smoking history I have found. He found the x-ray taken as part of his examination to be negative for pneumoconiosis. He said the Claimant's carboxyhemoglobin level was consistent with a non-smoker. Based on the negative x-ray evidence and other test results, he said the Claimant does not have either clinical or legal pneumoconiosis. He diagnosed chronic obstructive pulmonary disease, entirely due to smoking. He also diagnosed morbid obesity and Pickwickian syndrome with chronic respiratory failure, congestive heart failure, and sleep apnea.

I credit Dr. Repsher's opinion that the Claimant does not have clinical pneumoconiosis, because it is consistent with the radiological evidence. But I do not credit his opinion that the Claimant does not have legal pneumoconiosis. Dr. Repsher did not offer any creditable explanation why he excluded coal dust as a contributing factor to the Claimant's obstructive disease. Dr. Repsher's skepticism whether coal mine dust causes clinically significant COPD is inconsistent with the premise underlying the regulations that coal dust causes clinically significant COPD even in the absence of smoking. Dr. Repsher said that unlike smoking, coal dust does not cause significant loss in the $FEV_1$ or a reduction in the $FEV_1/FVC$ ratio. But the Department of Labor has specifically found that coal dust exposure may cause chronic obstructive pulmonary disease, with associated decrements in $FEV_1$ and the $FEV_1/FVC$ ratio:

> In addition to the risk of simple CWP and PMF, epidemiological studies have shown that **coal miners have an increased risk of developing COPD**. COPD may be detected from decrements in certain measures of lung function, **especially $FEV_1$ and the ratio of $FEV_1/FVC$**.[66]

Although pulmonary function testing is not diagnostic of pneumoconiosis, it would not make sense for the regulations to allow a claimant to establish total disability due to pneumoconiosis by showing a reduced $FEV_1$ or $FEV_1/FVC$ ratio were Dr. Repsher correct in his view. Dr. Repsher's opinion is not consistent with the premises underlying the regulations that coal dust exposure and cigarette smoking have additive effects, that they affect the lungs by similar mechanisms, and that coal dust exposure can cause clinically significant obstructive disease even in the absence of clinical pneumoconiosis. In light of the prevailing medical opinion accepted by the Department of Labor that coal dust and smoking have additive effects, a physician's opinion that focuses on the absence of clinical pneumoconiosis, and fails to explain why significant coal mine dust exposure was not a contributing or aggravating factor in a miner's obstructive disease, is entitled to less weight.[67] Dr. Repsher emphasized that the Claimant had not been exposed to coal dust since 2005. But it is not logical to focus on the last exposure to coal dust, when the Claimant had stopped smoking many years earlier in 1988. Moreover, Dr. Repsher was the only doctor who diagnosed the Claimant with congestive heart failure. That diagnosis is not supported by the treatment records, or by the opinions of either Dr. Houser or Dr. Renn. I find that Dr. Repsher's opinion is not well-documented or well-reasoned, and give it little weight.

---

[66] 65 Fed. Reg. at 79,943 (emphasis added).
[67] *Kirkling v. Peabody Coal Co.*, BRB No. 06-0712 BLA (BRB June 29, 2007), slip op. at 8–9; *R. G. v. Arch Coal Co.*, BRB No. 08-0369 BLA (BRB Feb. 25, 2009) (unpub.), slip op. at 4.

Dr. Renn's opinion fails on similar grounds. He excluded coal dust as a contributing factor to the Claimant's obstructive disease because the Claimant's obstructive impairment was responsive to bronchodilators, and coal dust causes a fixed impairment. But the Claimant's obstruction was only partially reversible, as the results did not return to normal after the administration of bronchodilators. Dr. Renn's explanation did not address the irreversible component of the obstruction. Dr. Renn said that hypercapnia is consistent with obstruction due to sleep apnea and smoking, but not coal dust. That statement is not consistent with the premise that smoking and coal dust damage the lungs by similar mechanisms. His reliance on a 20 ml improvement in the Claimant's $pO_2$ was based on a transposition error when he recorded the results of Dr. Houser's testing. And like Dr. Repsher, he, too, relied on the decreased $FEV_1/FVC$ ratio to distinguish between COPD caused by smoking from that caused by coal dust exposure. Neither Dr. Repsher nor Dr. Renn offered any creditable reason why the Claimant's coal mine dust exposure did not at least contribute to his lung disease. I find that Dr. Renn's opinion is not well reasoned, either, and give it little weight as well.

After weighing all of the medical opinions of record, I am persuaded by the Dr. Houser's opinion that both coal dust and smoking contributed to the Claimant's COPD. Thus I resolve the conflict in the medical opinion evidence by according the greatest probative weight to the opinion of Dr. Houser. All of the doctors who gave opinions were board certified pulmonologists. But Dr. Houser's opinion was in better accord with the evidence underlying his opinion and the premises underlying the regulations. Neither of the physicians who provided opinions on behalf of the Employer adequately explained why coal dust exposure was not a factor in the Miner's obstructive disease.

In addition, I must also weigh the x-ray and medical opinion evidence together. As the regulations allow, I conclude that the Dr. Houser's well-reasoned and documented medical opinion establishing the presence of legal pneumoconiosis outweighs the preponderantly negative radiological evidence. Thus I find that the Claimant has established that he has legal pneumoconiosis within the meaning of the Act and the regulations based on Dr. Houser's opinion.

### D.     Causal Relationship Between Pneumoconiosis and Coal Mine Employment

The Act and the regulations provide for a rebuttable presumption that pneumoconiosis arose out of coal mine employment if a miner with pneumoconiosis was employed in the mines for 10 or more years.[68] The Claimant was employed as a miner for at least 13 years, and therefore is entitled to the presumption. Moreover, to the extent that the Claimant has legal, as opposed to clinical pneumoconiosis, the causal relationship is established by Dr. Houser's opinion. I conclude that the Claimant has established that his pneumoconiosis was caused by his coal mine employment.

---

[68] 30 U.S.C. § 921(c)(1); 20 C.F.R. § 718.203(b).

### E.    Total Pulmonary or Respiratory Disability

A miner is considered totally disabled if he has complicated pneumoconiosis,[69] or if he has a pulmonary or respiratory impairment to which pneumoconiosis is a substantially contributing cause, and which prevents him from doing his usual coal mine employment and comparable gainful employment.[70] The regulations provide five methods of demonstrating total disability other than by the presence of complicated pneumoconiosis: (1) pulmonary function studies; (2) blood gas studies; (3) evidence of cor pulmonale with right-sided congestive heart failure; (4) reasoned medical opinion; and (5) lay testimony.[71] Lay testimony may only be used in establishing total disability in circumstances not applicable here. There is no evidence in the record that the Claimant suffers from complicated pneumoconiosis or cor pulmonale with right-sided congestive heart failure. Thus I will consider pulmonary function studies, blood gas studies and medical opinions. In the absence of contrary probative evidence, evidence from any of these categories may establish disability. If there is contrary evidence, however, I must weigh all the evidence in reaching a determination whether disability has been established.[72]

There are only two pulmonary function tests in evidence. Although the pre-bronchodilator tests were qualifying, the validity of both is in doubt. Both Drs. Repsher and Renn said Dr. Repsher's post-bronchodilator study was invalid. Dr. Houser and Dr. Renn agreed that Dr. Houser's post-bronchodilator study was valid. But it was not qualifying. I find that the Claimant has failed to establish that he is disabled based on the pulmonary function tests.

Both of the resting arterial blood gas studies resulted in qualifying values. Thus I find that the Claimant has established that he is disabled based on the arterial blood gas studies.

None of the Claimant's treating physicians expressed an opinion whether he is disabled. But all three doctors consulted in connection with the claim agree that he is disabled, even though there is some disagreement with the cause of his disability. I will address the cause of disability in a separate section. I find that the Claimant has established that he is disabled based on the medical opinions.

Finally, weighing like and unlike evidence together, the preponderance of both the qualifying blood gas study evidence, and the medical opinion evidence, support a finding of total disability. Although the pulmonary function tests did not result in qualifying values, I note that they do not contradict the blood gas studies, as they measure a different aspect of lung function. Moreover, I find that the qualifying arterial blood gas tests support the conclusion that the Claimant was disabled without regard to the exertion required by his last coal mine job as a mechanic. I find that the Claimant has established that he is totally disabled by a pulmonary or respiratory impairment based on the blood gas studies and the medical opinion evidence.

### F.    Cause of Total Disability

---

[69] 30 U.S.C. § 921(c)(3), 20 C.F.R. § 718.304.
[70] 30 U.S.C. § 902(f), 20 C.F.R. § 718.204(b) and (c).
[71] 20 C.F.R. § 718.204(b) and (d).
[72] 20 C.F.R. § 718.204(b)(2); *Fields v. Island Creek Coal Co.*, 10 BLR 1-19, 1-21 (1987); *Shedlock v. Bethlehem Mines Corp.*, 9 BLR 1-195, 1-198 (1986).

In order to be entitled to benefits, the Claimant must establish that pneumoconiosis is a substantially contributing cause to his. A substantially contributing cause is one which has a material adverse effect on the miner's respiratory or pulmonary condition, or one which materially worsens another respiratory or pulmonary impairment unrelated to coal mine employment.[73]

Dr. Houser stated explicitly that the Claimant's disability is due to his COPD. Although the pulmonary function testing was not qualifying, Dr. Houser described the exertional requirements of the Claimant's job as a mechanic for the Employer, demonstrating that he took them into account when he determined that the Claimant is disabled by his obstructive disease. I find his opinion on this issue to be documented and reasoned. Dr. Renn also said that the Claimant was disabled from performing his job as a mechanic by his obstructive disease. Only Dr. Repsher said that the Claimant's disability was not due to COPD. Instead, he said it was due to obesity-related respiratory problems, including congestive heart failure. But I have not credited his diagnosis of congestive heart failure. Nor did he offer any explanation why the Claimant's obstructive disease did not contribute to his hypercapnia. As a result, the weight of the creditable medical opinion evidence supports a finding that the Claimant is disabled by COPD, which was in turn caused at least in part by coal mine dust exposure.

The disagreement between Dr. Houser and Dr. Renn whether coal dust contributed to the Claimant's disabling obstructive disease must also be addressed. The current regulations state that unless otherwise provided, the burden of proving a fact rests with the party making the allegation.[74] The Benefits Review Board has held that the regulations place the burden on the claimant to establish total disability due to pneumoconiosis by a preponderance of the evidence.[75] Nothing in the commentary to the new rules suggests that this burden has changed; indeed, some language in the commentary indicates it has not changed.[76] The regulations require that pneumoconiosis be "a substantially contributing cause of the miner's totally disabling respiratory or pulmonary impairment."[77] In a Fourth Circuit case, the Court said it found it "difficult to understand" how an Administrative Law Judge (ALJ), who finds that a claimant has established the existence of pneumoconiosis, could also find that his disability is not due to pneumoconiosis on the strength of the medical opinions of doctors who had concluded that the Claimant does not have pneumoconiosis. The Court noted that there was no case law directly in point and stated that it need not decide whether such opinions are "wholly lacking in probative value." But the Court went on to hold:

> Clearly though, such opinions can carry little weight. At the very least, an ALJ who has found (or has assumed arguendo) that a claimant suffers from pneumoconiosis and has a total pulmonary disability may not credit a medical opinion that the former did not cause the latter unless the ALJ can and does

---

[73] 20 C.F.R. § 718.204(c)(1); *Hawkins v. Director, OWCP*, 907 F.2d 697, 705 (7th Cir. 1990); *Shelton v. Director, OWCP*, 899 F.2d 690 (7th Cir. 1990).

[74] 20 C.F.R. § 725.103.

[75] *Baumgardner v. Director, OWCP*, 11 BLR 1-135 (1986).

[76] *See* 65 Fed. Reg. 79923 (2000) ("Thus, a miner has established that his pneumoconiosis is a substantially contributing cause of his disability if it either has a material adverse effect on his respiratory or pulmonary condition or materially worsens a totally disabling respiratory or pulmonary impairment …").

[77] 20 C.F.R. § 718.204(c)(1).

S.App. 36

identify specific and persuasive reasons for concluding that the doctor's judgment on the question of disability does not rest upon her disagreement with the ALJ's finding as to either or both of the predicates in the causal chain.[78]

I can find no specific and persuasive reasons for concluding that Dr. Renn's judgment that exposure to coal dust did not cause or contribute to the Claimant's disability did not rest upon his disagreement with my finding that the Claimant has legal pneumoconiosis.

I find that the Claimant has established that his disability was caused by pneumoconiosis within the meaning of the statute and regulations based on the opinion of Dr. Houser.

## V.      FINDINGS AND CONCLUSIONS REGARDING ENTITLEMENT TO BENEFITS

The Claimant has met his burden to establish that he is totally disabled due to pneumoconiosis. He is entitled to benefits under the Act.

## VI.      DATE OF ENTITLEMENT

In the case of a miner who is totally disabled due to pneumoconiosis, benefits commence with the month of onset of total disability due to pneumoconiosis. Medical evidence of total disability does not establish the date of entitlement; rather, it shows that a claimant became disabled at some earlier date.[79] Where the evidence does not establish the month of onset, benefits begin with the month that the claim was filed, unless the evidence establishes that the miner was not totally disabled due to pneumoconiosis at any subsequent time.[80]

The Claimant filed his claim for benefits in December 2009. When he was examined by Dr. Houser in April 2010, he was already totally disabled. The record does not establish when he first became disabled, but there is no evidence that he was not disabled at any time after Dr. Houser examined him.

I find that the Claimant is entitled to benefits commencing in December 2009, the month in which he filed his claim.

## VII.      REPRESENTATIVE'S FEES

A representative's fee may be awarded in cases in which a claimant is found to be entitled to benefits.[81] The Claimant's representative has not yet filed an application for fees. The Claimant's representative is hereby allowed thirty days (30) days to file an application for fees. A service sheet showing that service has been made upon all parties, including the Claimant,

---

[78] *Toler v. Eastern Associated Coal Co.*, 43 F.3d 109, 116 (4th Cir. 1995). *See also Amax Coal Co. v. Director, OWCP*, 312 F.3d 882, 890 (7th Cir. 2002); *Scott v. Mason Coal Company*, 289 F.3d 263, 269–270 (4th Cir. 2002); *Adams v. Director, OWCP*, 886 F.2d 818, 826 (6th Cir. 1989).
[79] *Owens v. Jewell Smokeless Coal Corp.*, 14 BLR 1-47, 1-50 (1990).
[80] 20 C.F.R. § 725.503(b); *Harris v. Old Ben Coal Co.*, 23 BLR 1-98 (2006) (*en banc*).
[81] Section 28 of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 928, incorporated into the Black Lung Benefits Act at 30 U.S.C. § 932. For the regulations governing the award of fees, *see* 20 C.F.R. §§ 725.362–367.

- 26 -

must accompany the application. The Claimant is responsible for the payment of any fees awarded to a representative who is not an attorney.[82] The parties (including the Claimant) shall have 10 days following service of the application within which to file any objections, plus 5 days for service by mail, for a total of 15 days. The Act and regulations prohibit the charging of a fee in the absence of an approved application within which to file any objections. The Act and regulations prohibit the charging of a fee in the absence of an approved application.

## VIII.  ORDER

The claim for benefits filed by the Claimant on December 28, 2009, is **GRANTED**. Benefits are payable by the Employer.



Digitally signed by Alice Craft
DN: CN=Alice Craft, OU=Administrative
Law Judge, O=Office of Administrative
Law Judges, L=Cincinnati, S=OH, C=US
Location: Cincinnati OH

Alice M. Craft
Administrative Law Judge

**NOTICE OF APPEAL RIGHTS**: If you are dissatisfied with the Administrative Law Judge's decision, you may file an appeal with the Benefits Review Board ("Board"). To be timely, your appeal must be filed with the Board within 30 days from the date on which the administrative law judge's decision is filed with the district director's office.[83] The address of the Board is: Benefits Review Board, U.S. Department of Labor, P.O. Box 37601, Washington, DC 20013-7601. Your appeal is considered filed on the date it is received in the Office of the Clerk of the Board, unless the appeal is sent by mail and the Board determines that the U.S. Postal Service postmark, or other reliable evidence establishing the mailing date, may be used.[84] Once an appeal is filed, all inquiries and correspondence should be directed to the Board. After receipt of an appeal, the Board will issue a notice to all parties acknowledging receipt of the appeal and advising them as to any further action needed. At the time you file an appeal with the Board, you must also send a copy of the appeal letter to Associate Solicitor, Black Lung and Longshore Legal Services, U.S. Department of Labor, 200 Constitution Ave., NW, Room N-2117, Washington, DC 20210.[85] If an appeal is not timely filed with the Board, the Administrative Law Judge's decision becomes the final order of the Secretary of Labor.[86]

---

[82] *See Harrison v. Liberty Mutual Insurance Co.*, 3 F.L.R. 1-596,1-597 (1981). *See also* 20 C.F.R. § 725.365.
[83] *See* 20 C.F.R. §§ 725.478 and 725.479.
[84] *See* 20 C.F.R. § 802.207.
[85] *See* 20 C.F.R. § 725.481.
[86] 20 C.F.R. § 725.479(a).

S.App. 38

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 5, 2015, I electronically filed the foregoing Petitioner's Brief and Short Appendix with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed today the foregoing Petitioner's Brief and Short Appendix by first-class mail, postage prepaid to the following non CM/ECF participant:

> Shelly Rigsby Struthers
> Southern Illinois and Southwest Indiana
>   Respiratory Disease Program
> Corporate Square
> 2901 E. Ohio Blvd., Suite 235
> Terre Haute, Indiana  47803

> <u>s/Laura Metcoff Klaus</u>
> Laura Metcoff Klaus